**Supreme Court**

No. 2011-183-C.A.

(P2/09-2126A)

State                                    :

v.                                    :

Keith Harrison.                                    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State      :

v.       :

Keith Harrison.    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** The defendant, Keith Harrison, appeals from a judgment of conviction for simple domestic assault. This case came before the Supreme Court pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be summarily decided. After carefully considering the record, the memoranda submitted to this Court on behalf of the parties, and the oral arguments of counsel, we are of the opinion that cause has not been shown and that the appeal may be resolved without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of conviction.

## I

### Facts and Travel

On February 8, 2011, a Providence County Superior Court jury found defendant Keith Harrison guilty of simple domestic assault in violation of G.L. 1956 § 11-5-3 for head-butting his girlfriend, Cassandra Bey, during an argument in his studio apartment on May 6, 2009. The

same jury also acquitted defendant on two counts—felony domestic assault (see § 11-5-2) for allegedly having choked Ms. Bey with a scarf on May 1, 2009 and simple domestic assault (see § 11-5-3) for allegedly having kneed Ms. Bey in the stomach on May 6, 2009. The trial justice sentenced defendant to one year, with nine months to serve and three months suspended with probation.

On appeal, defendant contends that the trial justice erred when she denied his motion to suppress certain evidence, which was based on alleged violations of his Fourth and Fifth Amendment rights. The defendant also argues that the trial justice erred in denying his motion for a new trial.

**A**

**The Motion to Suppress**

Before trial, defendant moved to "suppress and/or preclude any testimony about or reference to handcuffs seized from [his studio apartment] on May 7, 2009." The court held a hearing on the motion to suppress on February 11, 2011. Patrolman Mark DeCecco of the Providence Police Department was the only witness to testify at the hearing.

Patrolman DeCecco testified that he was called to the police station at 1:25 a.m. on May 7, 2009 to meet with Ms. Bey. He told the hearing justice that Ms. Bey had come to the station from defendant's apartment; Patrolman DeCecco stated that Ms. Bey told him that defendant had head-butted her during an argument. He also described Ms. Bey's nose as having appeared bruised, swollen, and cut when she arrived at the station that morning.

Patrolman DeCecco stated that, when Ms. Bey met with him in the station, she told him that defendant had handcuffed her for thirty minutes during the argument. He also testified that

Ms. Bey had redness and swelling on both of her wrists. Patrolman DeCecco further stated that, when he asked Ms. Bey if defendant had any weapons, she said that he had knives.

Patrolman DeCecco testified that, after interviewing Ms. Bey, he walked to defendant's apartment with three of his fellow officers in order to "get [defendant's] side of the story." Patrolman DeCecco stated that, after the officers knocked on the door to the apartment, defendant opened the door and identified himself. In response to a question by the motion justice, Patrolman DeCecco testified that defendant let the officers into his apartment.

Patrolman DeCecco testified that defendant's apartment was "approximately 16 feet wide * * * and about 30 feet long" and had an "open floor plan." He stated that, when he entered, he went into the bedroom area of the apartment; he said that he went to that area because officers "try not to go into the kitchen area due to the fact that [there are] a lot of weapons." He further testified that "there was no door" to the bedroom and that his fellow officers "positioned themselves in front of the kitchen" while he was speaking with defendant in the bedroom area.

Patrolman DeCecco stated that, as soon as he entered the bedroom area, he noticed the following items on defendant's dresser: a pair of shackles,[1] a six-inch "military style knife," some smaller knives, and a hat. Patrolman DeCecco further testified that defendant was standing about five feet from the dresser; he added that he positioned himself between defendant and the dresser for "officer safety." Patrolman DeCecco told the hearing justice that he then asked defendant what had happened between him and Ms. Bey and that defendant replied that he and Ms. Bey "got into an argument and she left the apartment." Patrolman DeCecco testified that he then picked up the shackles, asked defendant if they were his, and defendant responded "yes." Patrolman DeCecco's testimony continued as follows:

---

[1] During his testimony at trial, Patrolman DeCecco clarified that the "shackles" he referred to during the suppression hearing were "leg shackles."

"Q: And what if anything did you do next?

"A: At that time I asked him if he had any more handcuffs[2] in the apartment. He stated 'no.'

"* * *

"Q: Now, what is the next thing you did, Officer?

"A: At that time I looked around the dresser area. I moved the hat from the dresser, and I noticed the second pair[3] of handcuffs.

"Q: Let me ask you this. Why did you move the hat?

"A: For officer safety, making sure there was nothing else that I don't know about."

At this point during Patrolman DeCecco's testimony, the hearing justice asked the prosecution for "the legal basis for the search under the hat and the obtaining and confiscating the cuffs."

During the testimony that followed, Patrolman DeCecco stated that, when he arrived at defendant's apartment, he was not planning on arresting defendant immediately because "there was a possibility that [defendant and Ms. Bey] might have got into a fight, and I wanted to get [defendant's] side of the story." When Patrolman DeCecco was asked just when it was that he knew he was going to arrest defendant, he replied: "Once [defendant] stated that [he] and Miss Bey got into an argument and she fled the scene." Patrolman DeCecco testified that defendant made that statement before the officer moved the hat and discovered the handcuffs. He acknowledged, however, that he did not actually arrest defendant until after he had picked up the hat and uncovered the handcuffs.

---

2     It appears that Patrolman DeCecco misspoke when he referred to "any more handcuffs." As indicated in footnote 1, supra, Patrolman DeCecco later testified that the "shackles" that he first saw on the dresser were a pair of leg shackles.

3     See footnote 2, supra.

After listening to Patrolman DeCecco's testimony, the hearing justice issued a ruling from the bench. She first found as follows: "[W]hen the officer went to investigate, he was not going to arrest the Defendant. That was not the goal. The goal was to investigate to find out his side of the story." The hearing justice later stated:

> "The [c]ourt finds that the credible evidence and the reasonable inference as the [c]ourt draws from the evidence suggests that the officer asked [defendant] what happened. He told him. The officer was suspicious. He had seen the injuries. He had spoken to the young woman. He asked him if he had handcuffs, and he said no. Then he nosed around the dresser and found the handcuffs. And that is what triggered the arrest. * * * What triggered [the arrest] had to be the discovery of the handcuffs after he said he didn't have handcuffs, in light of the cuff marks on [Ms. Bey's] wrist."

The hearing justice then concluded that the search was not incident to an arrest and that that exception to the warrant requirement did not apply.

The hearing justice granted defendant's motion to suppress the handcuffs as trial evidence. The prosecutor then informed the court that she wanted Patrolman DeCecco to be able to testify regarding the knives that he had seen on the dresser. She stated that Ms. Bey would be testifying that, during her argument with defendant, he used a knife to get into the bathroom. The hearing justice ruled that Patrolman DeCecco's testimony that he had seen a knife "would be in because there's going to be some testimony [from Ms. Bey] that he had a knife." The hearing justice commented that that evidence went "to credibility."

Finally, the hearing justice ruled that testimony regarding the leg shackles would be barred because it was "not relevant"; she further stated that such testimony would be "too

confusing" for the jury in light of what she considered to be the similarity between shackles and handcuffs.[4]

**B**

**Trial**

The three-day trial of defendant began on February 3, 2011. The prosecution called Patrolman DeCecco as its first witness. He reiterated for the jury much of the same testimony that he had offered at the suppression hearing. He stated that he had been called to the police station to meet with Ms. Bey at 1:30 a.m. on May 7, 2009. Patrolman DeCecco testified that, when he met her, she was "crying, shaking"; he added that the first thing that he observed was "a cut and swelling to her nose." He stated that he also noticed that Ms. Bey had "redness and swelling to the front forearm part of her wrist where [defendant] handcuffed her." Patrolman DeCecco told the jury that he interviewed Ms. Bey for fifteen to twenty minutes and took her statement. On the stand, he also identified photographs of Ms. Bey's face and forearms that were taken at the station after the incident.

Patrolman DeCecco testified that, after interviewing Ms. Bey, he went to defendant's apartment with three other patrol officers. He stated that the officers knocked on the door of the apartment and that defendant answered and identified himself; he added that the officers then "entered into the apartment to talk." Patrolman DeCecco testified that he went to the "bedroom area" to speak with defendant. He agreed that defendant's apartment had an "open floor plan" and that it would be "classified as a studio apartment."

---

[4] The hearing justice based her ruling on Rule 403 of the Rhode Island Rules of Evidence, which reads in pertinent part as follows: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *."

Patrolman DeCecco testified that there was one large knife with a six-inch blade on the dresser in the bedroom alongside several other smaller knives. Patrolman DeCecco stated that, when he asked defendant what had happened earlier, defendant "said he got into an argument with his girlfriend, the complainant, Miss Bey, and she fled the apartment."

The questioning of Patrolman DeCecco by the prosecutor continued as follows:

"Q: Did you ask [the defendant] anything else?

"A: Yes.

"Q: What did you ask him?

"A: If he owned a pair of handcuffs.

"Q: What did he respond?

"DEFENSE COUNSEL: Objection, Judge.

"THE COURT: Overruled.

"A: He said yes, he did."

At that point, the trial justice directed that the jury and Patrolman DeCecco be removed from the courtroom. The trial justice pointed out that, during the suppression hearing, Patrolman DeCecco had "testified under oath * * * that he asked [defendant] if he had any handcuffs, and he said no." She further noted that, during the suppression hearing, the officer stated that defendant had acknowledged that he owned the leg shackles, but not the handcuffs. The trial justice then called Patrolman DeCecco back into the courtroom and began to address the inconsistency between Patrolman DeCecco's testimony at the suppression hearing and his testimony at trial. The trial justice stated that, "[i]n the interest of justice," she wanted to find out whether Patrolman DeCecco had "changed his testimony or if he was unclear at the motion to suppress, which [didn't] trouble [her] terribly because [she] granted the motion."

With the jury still removed from the courtroom, Patrolman DeCecco reaffirmed what he had just testified to at trial; he stated that, on May 7, 2009, he had asked defendant if he owned handcuffs and that defendant admitted that he did. He further stated that, once he discovered the handcuffs under the hat, defendant had denied that those handcuffs belonged to him. After hearing Patrolman DeCecco's explanation, the trial justice reiterated the ruling made at the suppression hearing:

> "I rule that the evidence of the handcuffs, the cuffs found under the hat, would be suppressed for all of the reasons I stated on Tuesday. I incorporate them by reference.
>
> "* * *
>
> "[T]he knife which was in plain view could have been seized. It was not seized. But the testimony about it under all of the facts and circumstances presented can stand. The shackles, the problem is the [Rule] 403 problem. It's not relevant. Or whatever probative value it has is substantially outweighed by the chance of prejudice or confusion."

Counsel for defendant then raised a new issue; he argued that defendant was in police custody once the officers entered his apartment and that, therefore, he should have been read his Miranda[5] rights before being questioned by Patrolman DeCecco about handcuffs.

The trial justice allowed defense counsel to question Patrolman DeCecco with respect to the Miranda issue outside the presence of the jury. Patrolman DeCecco testified that, before he went to defendant's apartment on May 7, he had already completed paperwork which stated that there was probable cause to arrest defendant. He also agreed that defendant "was not free to just leave" once the officers entered defendant's apartment that morning. He agreed that, if defendant "had turned around and left, [he] would have arrested him at that point." He further stated that he did not advise defendant of his Miranda rights when he entered the apartment. The

---

[5]    See Miranda v. Arizona, 384 U.S. 436 (1966).

officer also stated that he did not inform defendant that he was under arrest before he began questioning him; he added that he had gone to the apartment with the intention of "find[ing] out [defendant's] side of the story."

The trial justice then questioned Patrolman DeCecco as follows:

> "Q: You testified that if the Defendant had left the bedroom, left the house, you would have arrested him?
>
> "A: Yes, Your Honor.
>
> "Q: Okay, and what if anything did you say or do to communicate that to the Defendant?
>
> "A: Nothing, Your Honor, besides officer[] presence.
>
> "Q: Did you get the impression that the officer presence was sufficient for the Defendant to recognize that he wasn't free to leave?
>
> "PROSECUTION: Judge, I object.
>
> "Q: Was that the type of officer presence that you were creating?
>
> "A: Essentially, yes. It's more for officer safety * * * from my experience, Your Honor. At nighttime we very seldom do anything by ourselves. We always work as a group for our safety."

The trial justice then asked the officer to "describe the atmosphere" at the apartment, and he stated: "It was not aggressive. [The defendant] was compliant with us. He was willing to answer the questions." When asked if the officers were purposefully positioned "so that Mr. Harrison would not leave," Patrolman DeCecco replied: "No. In this situation[] it was because of a lack of space inside the apartment."

The trial justice then made the following ruling with respect to the Miranda issue:

> "In this case, there's no question there was a level of coerciveness. Attendance with police presence in your home and a police officer questioning you about an event that the Defendant would certainly know was the result of a complaint that Miss Bey would have made. There wasn't any secret. He said, 'My girlfriend and I had a fight, and she left.' But that doesn't rise to the level of custody

- 9 -

as contemplated by <u>Miranda</u>. So the question about the handcuffs came at a point in time when the Defendant was not actually in custody as understood by <u>Miranda</u>."

She further ruled:

"I find that the knife was in plain view, and as such, the testimony concerning the knife can stand. The testimony concerning the handcuffs can stand subject to cross-examination."

The prosecution proceeded to call Ms. Bey as its second witness. She told the jury that, in May of 2009, she had been dating defendant for approximately two years. When asked to describe their relationship at that time, she stated that it was "harsh." Ms. Bey then told the jury about an incident that occurred on May 1, 2009; specifically, Ms. Bey testified that she lost consciousness after defendant had choked her with a scarf during an argument at his apartment.

Ms. Bey further testified that, on May 6, a friend dropped her off at defendant's apartment. She told the jury that, upon arriving, she saw defendant's ex-girlfriend in a car outside the apartment. Ms. Bey testified that she became upset and that she then saw defendant walking towards his ex-girlfriend's car. Ms. Bey stated that, at that time, defendant told her "not to start anything." She testified that she then "went inside the house like he told me to."

Ms. Bey said that, while defendant was out of the apartment, his phone rang and she answered it. Ms. Bey testified that, when defendant returned two minutes later, he began yelling at her because she had answered his phone while he was out. Ms. Bey told the jury that defendant then accused her of "getting too close" to a male friend of hers; she stated that they then engaged in what Ms. Bey described as a "phone battle," during which they were "fighting for" her phone. Ms. Bey testified that, during this argument, defendant handcuffed her right arm. Ms. Bey stated that, as they continued to argue, defendant "end[ed] up head-butting" her by "[t]aking his head and crashing it towards [her]."

Ms. Bey told the jury that there came a moment when her phone dropped to the floor and shattered. It was her further testimony that she then went to the floor in order to grab the phone's SIM card.[6] She said that she put the card in her mouth because she "didn't want [defendant] going through [her] phone contacts." Ms. Bey told the jury that defendant then handcuffed her other arm so that her hands were held behind her back. She stated that she swallowed the SIM card when defendant put his finger in her mouth to look for the card.

Ms. Bey stated that defendant then unhandcuffed one of her wrists and told her to look for the SIM card on the floor because he did not believe that she had swallowed it. Ms. Bey testified that she proceeded to take defendant's phone into the bathroom and locked the door behind her so that she could call 911. She told the jury that, while she was in the bathroom trying to make the call, defendant called the phone in her possession from yet another phone, heard it ringing, and then unlocked the bathroom door with a knife. Ms. Bey added that she had seen him do such a thing "plenty of times"; she explained that "[t]he door sometimes locks, so you pop it open with a knife."

Ms. Bey stated that, once defendant entered the bathroom, he began yelling at her, pushed her against the wall, and pressed his body against her so that his knee and elbow were on her stomach and chest. Ms. Bey testified that the pressure "made [her] throw up." Ms. Bey stated that, soon thereafter, defendant went to a first-floor apartment to speak with a friend of his and that she then ran out of the apartment.

Ms. Bey testified that she walked to the police station, where she reported the incident to Patrolman DeCecco. Ms. Bey also identified for the jury the photographs taken by the police at

---

[6]     A "SIM card" is "a card that is inserted into a device (as a cell phone) and that is used to store data (as phone numbers or contact information)." http://www.merriam-webster.com/dictionary/SIMcard (last visited May 17, 2013).

the station. Specifically, she pointed to the "picture of [her] eyes and [her] nose all swollen from the head-butt." She also pointed to a picture of her "swollen" wrists; she stated that the swelling was a result of "the pressure of the handcuffs."

The defense called two witnesses. The first was Sgt. Edward Ryan of the Providence Police Department. Sergeant Ryan stated that he was working on the morning of May 7, 2009 and that he met with Ms. Bey at 1:15 a.m. He testified that Ms. Bey came into the police station "complaining of a domestic"; he said that she told him that she had been handcuffed "in the front of her body"—a statement that was inconsistent with Ms. Bey's trial testimony that her hands had been cuffed behind her back. As the second witness for the defense, counsel recalled Patrolman DeCecco to the stand. He stated that, when he met with Ms. Bey at the station on May 7, she told him that defendant had taken her handcuffs off before she ran into the bathroom—a statement that was inconsistent with Ms. Bey's testimony that one of her wrists was still in handcuffs at that time.

On February 9, 2011, the jury found defendant guilty of simple domestic assault for having head-butted Ms. Bey. The jury also found defendant not guilty of felony domestic assault for allegedly having choked Ms. Bey with a scarf and simple domestic assault for allegedly having kneed Ms. Bey in the stomach. The defendant moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, arguing that the verdict was "against the fair preponderance of the evidence and fail[ed] to do substantial justice." On February 22, 2011, the motion was denied. On the same day, the trial justice sentenced defendant to one year, with nine months to serve and three months suspended with probation. The defendant thereafter filed a timely notice of appeal.

## II

## Analysis

### A

### The Motion to Suppress

The defendant contends that the trial justice committed reversible error when she allowed Patrolman DeCecco to testify about defendant's admission that he owned handcuffs. First, defendant argues that the statement should have been suppressed because it was given while he was in police custody and before the police read him his <u>Miranda</u> rights. Second, defendant maintains that the police obtained the admission during an illegal search and seizure. In our judgment, neither of these arguments has merit.

### 1

### Standard of Review

When reviewing a motion to suppress, this Court will not overturn a trial justice's factual findings unless they are clearly erroneous. <u>State v. Page</u>, 709 A.2d 1042, 1044 (R.I. 1998). However, "[w]hen reviewing an alleged violation of a defendant's constitutional rights, this Court must make an independent examination of the record to determine if [the defendant's] rights have been violated." <u>State v. Goulet</u>, 21 A.3d 302, 311 (R.I. 2011) (internal quotation marks omitted). When performing this independent examination, we must "view the evidence in the record in the light most favorable to the state." <u>Id.</u> Accordingly, we will reverse a trial justice's findings on a motion to suppress only if "(1) his or her findings concerning the challenged statements reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were

denied." State v. Grayhurst, 852 A.2d 491, 513 (R.I. 2004) (internal quotation marks omitted); see also State v. Collodo, 661 A.2d 62, 64 (R.I. 1995).

**2**

**Analysis of the Miranda Contention**

Almost half a century ago, the United States Supreme Court held that, "prior to custodial interrogation a suspect must receive explicit warnings concerning his constitutional privilege against self-incrimination and his right to counsel." See State v. Amado, 424 A.2d 1057, 1061 (R.I. 1981) (discussing Miranda v. Arizona, 384 U.S. 436, 479 (1966)). The prosecution must show a "voluntary, knowing, and intelligent waiver of Miranda rights * * * before comments made by a defendant during custodial interrogation can be admitted into evidence." State v. Marini, 638 A.2d 507, 511 (R.I. 1994) (emphasis omitted). If the prosecution cannot meet its burden, then "the Miranda exclusionary rule places all statements elicited during such interrogation beyond the state's reach at trial." State v. Caruolo, 524 A.2d 575, 579 (R.I. 1987).

As a matter of law, the exclusionary rule of Miranda does not apply unless the defendant (1) was in custody and (2) was interrogated. State v. Edwards, 810 A.2d 226, 239 (R.I. 2002); see also Caruolo, 524 A.2d at 579 ("By its own terms the [Miranda] rule applies only when interrogation occurs within the coercive atmosphere of police custody.").

It is undisputed that defendant was not informed of his Miranda rights before Patrolman DeCecco asked him whether he owned handcuffs. It is also undisputed that Patrolman DeCecco posed a question to defendant, thereby satisfying the interrogation requirement of Miranda. See State v. Jimenez, 33 A.3d 724, 733 n.11 (R.I. 2011) (defining "interrogation" as "express questioning" or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect" (internal quotation marks omitted)). Accordingly, the admissibility of defendant's statement about the handcuffs hinges on whether defendant was in custody when Patrolman DeCecco asked him about the handcuffs. See Marini, 638 A.2d at 511.

The "decisive test" for resolving the custody requirement is whether or not a person's "freedom of movement is restricted to the degree associated with formal arrest." Caruolo, 524 A.2d at 579. The custody determination "depends on the objective circumstances of the interrogation." Stansbury v. California, 511 U.S. 318, 323 (1994). This Court has also recognized that a "person is seized or under arrest for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave." Jimenez, 33 A.3d at 732 (internal quotation marks omitted). We have stated that four factors may be considered when making this determination: "(1) the extent to which the person's freedom [was] curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police." Id. Finally, it is important to remember that "custody as contemplated by Miranda does not exist merely because * * * the interrogated person is suspected of a crime or is the focus of a police investigation." Caruolo, 524 A.2d at 579.

It is our view that the trial justice correctly determined that defendant was not in custody when Patrolman DeCecco asked him whether he owned handcuffs. He testified during the suppression hearing that defendant allowed the police to enter his apartment. See Jimenez, 33 A.3d at 732 (ruling that the defendant was not in custody where two police officers "were voluntarily admitted into the apartment"). The interview then took place inside defendant's home. See United States v. Hughes, 640 F.3d 428, 435–36 (1st Cir. 2011) (recognizing that a suspect's home "generally presents a less intimidating atmosphere than, say, a police station").

Patrolman DeCecco described the "atmosphere" as "not aggressive," noting that defendant "was compliant with" the police and "was willing to answer the questions." See Jimenez, 33 A.3d at 733 (noting that the defendant in that case "spoke calmly to [the police officer], voluntarily answering his questions without [the police officer] raising his voice or exerting any force over [the] defendant"). Patrolman DeCecco's description was not contradicted. The officer further testified—again without contradiction—that he asked defendant only one question (viz., "What happened tonight?") before posing the question about the handcuffs. See id. (holding that the defendant was not in custody even though he was questioned by police for forty-five minutes). There was also no evidence that Patrolman DeCecco had initiated any "formal procedures * * * indicating that [the] defendant was under arrest or that his freedom was in any way restricted." See id.

The defendant emphasizes the fact that the officers never explicitly told him that he was free to leave at any time. We have previously stated, however, that such silence is not a dispositive factor: "the fact that [a] defendant was not informed * * * that he was free to leave does not change our determination that [the] defendant was not in custody." Jimenez, 33 A.3d at 733; see also State v. Girard, 799 A.2d 238, 248 (R.I. 2002). The defendant further argues that he was in custody when the officers arrived because (1) Patrolman DeCecco had already completed paperwork memorializing his opinion that there was probable cause to arrest defendant and (2) Patrolman DeCecco stated that he made the decision to arrest defendant before he found handcuffs on the dresser. The motion justice, however, found that Patrolman DeCecco went to defendant's apartment "to investigate to find out his side of the story," and that, initially, an arrest "was not the goal." Instead, she found that the arrest was "triggered" when Patrolman

- 16 -

DeCecco uncovered the handcuffs under the hat on the dresser. We perceive no basis for concluding that these findings were clearly erroneous.

Further, defendant's argument ignores the well-established principle that "the initial determination of custody depends on <u>the objective circumstances</u> of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>See</u> <u>Stansbury</u>, 511 U.S. at 323 (emphasis added). Accordingly, Patrolman DeCecco's unspoken probable cause analysis is irrelevant to determining whether or not defendant was in custody when Patrolman DeCecco asked him about handcuffs.

We recognize that the presence of four police officers in defendant's apartment made the scenario more coercive than it would have been if Patrolman DeCecco had arrived alone. Of course, "a certain degree of coerciveness inheres in any police interrogation of a person suspected of a crime simply because of the aura of authority surrounding the interrogating officer * * *." <u>State v. Hobson</u>, 648 A.2d 1369, 1371 (R.I. 1994); <u>see also</u> <u>Hughes</u>, 640 F.3d at 436 (noting that the presence of four officers in a "small" home was "impressive but not overwhelming"). That inherent coerciveness, however, does not transform every police interrogation into a <u>custodial</u> interrogation. <u>See</u> <u>Hobson</u>, 648 A.2d at 1371. Patrolman DeCecco testified that the officers went in a group out of concern for "officer safety" and that officers "seldom do anything by [them]selves" at night. The trial justice found that Patrolman DeCecco's three fellow officers were positioned away from the bedroom during the interview, and she properly concluded that the distance "made the atmosphere less coercive, not more coercive." <u>See</u> <u>Hughes</u>, 640 F.3d at 436 (holding that a defendant was not in custody when there was "nothing in the record to suggest that [four] officers either exploited [the home's] cozy confines or invaded the defendant's personal space"). We are not persuaded that, on the basis of

the officers' presence alone, defendant's "freedom of movement [was] restricted to the degree associated with formal arrest." Caruolo, 524 A.2d at 579.

**3**

**The Fourth Amendment Contention**

The defendant next contends that his admission that he owned handcuffs was improperly admitted into evidence because "that admission was obtained during a search and seizure that was conducted in violation of his Fourth Amendment rights." Again, we disagree.

Before we begin our analysis, we reiterate that the jury did not hear any evidence regarding the fact that Patrolman DeCecco actually found handcuffs at defendant's apartment. As mentioned above, the hearing justice granted defendant's motion to suppress that evidence. The defendant's argument on appeal is limited to challenging the fact that the trial justice allowed Patrolman DeCecco to testify regarding defendant's admission that he owned handcuffs.

The Fourth Amendment to the United States Constitution "prohibits a warrantless entry into a person's home to perfect an arrest or perform a search." State v. Barkmeyer, 949 A.2d 984, 996 (R.I. 2008) (citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)). Evidence may not be introduced at trial if it is "obtained either during or as a direct result of searches and seizures in violation of an individual's Fourth Amendment rights." State v. Jennings, 461 A.2d 361, 368 (R.I. 1983). Further, the exclusionary rule applies to more than just physical evidence; the United States Supreme Court has long recognized that "verbal evidence which derives so immediately from an unlawful entry * * * is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." Wong Sun v. United States, 371 U.S. 471, 485 (1963); see also State v. Maloof, 114 R.I. 380, 386, 333 A.2d 676, 679 (1975) ("[O]ral

evidence as well as physical evidence could be the subject of a search and seizure which, in turn, had to satisfy the requirements of the [F]ourth [A]mendment.").

On appeal, defendant does not argue that the police illegally entered his apartment in violation of his Fourth Amendment rights. Nor could he—Patrolman DeCecco testified that defendant let him and his fellow officers enter the apartment, and his testimony was not contradicted. See Barkmeyer, 949 A.2d at 996 ("The Fourth Amendment prohibition against the warrantless entry into a person's home does not apply to situations in which voluntary consent has been obtained * * *." (internal quotation marks omitted)). The defendant instead argues that Patrolman DeCecco should have conducted the interview in the entryway of the 15-by-30-foot studio apartment rather than in the bedroom area. The defendant contends that Patrolman DeCecco "had no right to enter [defendant's] bedroom without a warrant or consent" and that, since defendant admitted that he owned handcuffs while he was with the officer in the bedroom, the statement should have been suppressed.

The defendant bases his argument on the principle that the exclusionary rule applies "when the giving of a statement is induced by confronting a suspect with illegally seized evidence." See Jennings, 461 A.2d at 368. We are well aware of that sound principle; however, defendant has not explained how it applies to this case. During the trial, Patrolman DeCecco testified that he asked defendant whether he "owned a pair of handcuffs." He told the jury that defendant replied "yes." The defendant made this admission without being "confront[ed] * * * with illegally seized evidence." See id. At the time that he asked the question, Patrolman DeCecco had just come to defendant's apartment from the police station, where Ms. Bey had described an altercation that she had with defendant. She had told Patrolman DeCecco that defendant had handcuffed her against her will, and the patrolman stated that he had observed

redness and swelling on her wrists. Patrolman DeCecco's question to defendant about handcuffs naturally arose from his meeting with Ms. Bey. It was <u>after</u> defendant had already answered the patrolman's question that the handcuffs were discovered under the hat on the dresser.

The defendant allowed the police into his studio apartment and consented to an interview. He was asked a question about handcuffs and he freely gave an answer; the question was not prompted by "illegally seized evidence," nor was the answer induced by "illegally seized evidence." <u>See</u> <u>Jennings</u>, 461 A.2d at 368. After independently examining the record and viewing the evidence in the light most favorable to the state, we conclude that the trial justice did not violate defendant's constitutional rights by allowing Patrolman DeCecco to testify regarding defendant's admission that he owned handcuffs. <u>See</u> <u>Goulet</u>, 21 A.3d at 311.

**B**

**The Motion for a New Trial**

The defendant's final argument on appeal is that the trial justice erred in denying his motion for a new trial. We disagree.

On appeal, "we accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." <u>State v. Guerra</u>, 12 A.3d 759, 766 (R.I. 2011) (internal quotation marks omitted). We will not disturb the trial justice's analysis unless he or she has "overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." <u>State v. Morales</u>, 895 A.2d 114, 119 (R.I. 2006) (internal quotation marks omitted).

The defendant contends that the trial justice erred in denying his motion for a new trial because, in defendant's view, Ms. Bey's testimony "was not worthy of belief and the guilty

verdict * * * failed to do substantial justice." It is our opinion, however, that the trial justice's denial of the motion for a new trial should be affirmed.

When passing on a motion for a new trial, the trial justice "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (internal quotation marks omitted). The trial justice conducts a three-step analysis when making this determination. State v. Rivera, 839 A.2d 497, 502–03 (R.I. 2003). First, the trial justice must "consider the evidence in light of the jury charge." Morales, 895 A.2d at 121. Second, the trial justice must "independently assess the credibility of the witnesses and the weight of the evidence." Id. Finally, the trial justice must "determine whether he or she would have reached a result different from that reached by the jury." Id. If, at the end of the analysis, the trial justice agrees with the jury's verdict or determines "that reasonable minds could differ," then "the analysis is complete and the verdict should be affirmed." State v. DeOliveira, 972 A.2d 653, 665 (R.I. 2009). If, however, the trial justice does not agree with the verdict or does not agree that reasonable minds could differ, then the trial justice "must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." Id.

After carefully reviewing the record, we are convinced that the trial justice properly analyzed defendant's motion for a new trial. She found that Ms. Bey "was truthful and she did her best to give the truthful statements certainly as it relates to the head-butting incident," which she described as "probably the easiest [charge] for the jury to determine." The trial justice further noted that, had she "been sitting on this case without a jury, [she] would have found the [d]efendant guilty of the offense for which he was convicted."

The defendant argues that Ms. Bey's story was "completely beyond belief" and that her testimony regarding the head-butting incident was "so completely lacking in credibility" that the verdict should not have been permitted to stand.[7] We have held, however, that the "mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." State v. Rivera, 987 A.2d 887, 903 (R.I. 2010). To further this point, we recognize that "it is the trial justice who has [had] the opportunity to observe the witnesses as they testify and therefore is in a better position to weigh the evidence and to pass upon the credibility of the witnesses than is this [C]ourt." Id. (internal quotation marks omitted). In this case, the trial justice found that Ms. Bey was "a credible witness." There was also corroborating evidence: the trial justice pointed to the fact that the assault "was reported shortly after the event occurred" and that there were photographs "depict[ing] the injury to [Ms. Bey's] face, particularly her nose."

We perceive nothing in the record that would indicate that the trial justice either "committed clear error or * * * misconceived material and relevant evidence [relating] to a critical issue in the case." See State v. Texieira, 944 A.2d 132, 141 (R.I. 2008) (internal quotation marks omitted). Accordingly, we are satisfied that the trial justice did not err in denying the defendant's motion for a new trial.

---

[7] The defendant points to inconsistencies in Ms. Bey's testimony to support his argument. For instance, he contends that Ms. Bey was "wildly inconsistent" about the manner in which she was handcuffed—viz., whether she was handcuffed behind her back or in the front of her body. We note, as did the trial justice, that such evidence dealt with collateral matters and that the alleged inconsistencies were "not material" to the head-butting assault. Further, we have stated that "any inconsistencies in * * * testimony are appropriately addressed on cross-examination and do not necessarily negate the value" of that testimony. State v. Nania, 786 A.2d 1066, 1068 (R.I. 2001). The defense had the opportunity to address these inconsistencies on cross-examination; yet it was unable to create a reasonable doubt in the minds of the jury or the trial justice with respect to the charge of which defendant was convicted.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**          State v. Keith Harrison.

**CASE NO:**          No. 2011-183-C.A.
                                  (P2/09-2126A)

**COURT:**          Supreme Court

**DATE OPINION FILED:**   May 20, 2013

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice William P. Robinson

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                                  Associate Justice Netti C. Vogel

**ATTORNEYS ON APPEAL:**

                                  For State:  Jane M. McSoley
                                          Department of Attorney General

                                  For Defendant:  Janice M. Weisfeld
                                          Office of the Public Defender