**Supreme Court**

No. 2012-254-C.A.

(P1/09-2645A)

State                                    :

v.                                    :

Adam Lake.                                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Adam Lake. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** The defendant, Adam Lake, appeals to this Court from a judgment of conviction after a jury found him guilty of two counts of first-degree child molestation sexual assault. The justice of the Superior Court who had presided over the trial sentenced the defendant to two concurrent terms of forty years imprisonment, with twenty-five years to serve and fifteen years suspended, with probation.

On appeal, defendant contends that the trial justice abused her discretion in denying his motion for a new trial because, in defendant's view, she overlooked and misconceived material evidence; defendant further asserts that the verdict failed to truly respond to the evidence and failed to do substantial justice between the parties.

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction.

# I

## Facts and Travel

The complaining witness, Avis,[1] was born on December 8, 1997. In early July of 2009, when she was eleven years old, Avis disclosed to her twelve-year-old sister Marion that defendant, their stepfather, had sexually molested her multiple times. Marion thereafter revealed Avis's accusations to Wendy, who is the mother of both girls.

On August 14, 2009, a Providence County grand jury indicted defendant on three counts of first-degree child molestation sexual assault in violation of G.L. 1956 § 11-37-8.1; the charged offenses were alleged to have occurred between August 1, 2008 and May 31, 2009. Counts One and Three both alleged "penile/vaginal penetration," and Count Two alleged "penile/anal penetration."

In due course, a jury trial was held over four days in January of 2012. We summarize below the salient aspects of what transpired at trial.

## A

## The Testimony at Trial

### 1. The Testimony of the Complaining Witness

At the time of trial, Avis, who was then fourteen years old, testified that she had known defendant since she was four years old—initially as a family friend when her mother, Wendy, began dating him and later when he became her stepfather, after the couple married in 2005. She added that defendant would babysit for her and her five siblings when Wendy was out of the house. Avis testified about the vaginal intercourse which she alleged she had been subjected to

---

[1] In order to respect the privacy of the complaining witness and that of her family, we have used pseudonyms in referring to the complaining witness ("Avis"), her sister ("Marion"), and the mother of both girls ("Wendy"). For the same reason, we have omitted their surnames. In doing so, we intend no disrespect.

by defendant on multiple occasions; she also testified as to incidents of anal penetration, although she acknowledged that those incidents had occurred "rarely." Her testimony then focused on three particular incidents when defendant had sexually molested her, and those were the incidents referenced in the three counts of the indictment.

With respect to Count One, Avis stated that defendant sexually molested her for the first time at her home on Holton Street in Providence;[2] it was her testimony that, on that occasion, all of her brothers and sisters were home and her mother was away from home. Avis testified that she had been lying on her side next to defendant on his bed tickling his back when defendant said to her: "Have you ever had sex with anyone before?" She further testified that, after she replied in the negative, he said: "You're going to find out." She stated that defendant then "turn[ed] around and [grabbed]" her by her shoulders so that she was lying on her back and that he proceeded to pull down her pajama pants and underwear. She further described, with specificity, how defendant then engaged in vaginal intercourse with her. Avis stated that she was crying and that she told defendant that he was hurting her. She explained, however, that she did not yell out for help because she "didn't know how to react" and that she was "shocked." Avis stated that defendant then told her that, if she told anyone about what happened, he would take her away; and she acknowledged that she believed defendant's statement to that effect.

Avis then testified with respect to another incident of sexual molestation (Count Two) that occurred while she was still living on Holton Street. Avis initially testified that defendant penetrated her vaginally on that occasion; however, she then changed her testimony and said that the intercourse was either vaginal or anal but that she could not remember which it was. After

---

[2]     It is clear from the record that the first incident about which Avis testified occurred in August of 2008. She was ten years old at that time.

having her memory refreshed by her testimony at defendant's bail hearing, Avis stated that defendant had penetrated her anally.

Avis testified that the incident that gave rise to Count Three occurred when she was living on Harold Street in Providence in March of 2009. It was Avis's testimony that she had been with Marion in the bedroom which they shared when defendant entered the room and asked Marion to leave so that he could talk to Avis. She testified that defendant then engaged in vaginal intercourse with her in a manner similar to what had taken place on the first occasion that she testified about at trial.

Avis acknowledged that, at some point after the just-described incident had taken place, she responded in the negative to a question posed by Marion as to whether anything was "happening" between her and defendant. She testified that Marion asked her the same question once again after defendant had moved out of the home in May of 2009 and that she then admitted that defendant had penetrated her vaginally "multiple times."[3] She further testified: "I figured that I was sick and tired of him sexually abusing me and I felt gross, grossed out helpless, and desperate for help." She stated that she had not previously revealed the sexual molestation to anyone when defendant had left[4] the home on other occasions because she had been "scared" due to defendant's threats and because she "knew he was going to come back. He always did."

---

[3]     Marion also testified with respect to the conversation that is referenced in the text. Her testimony corroborated her sister's testimony. However, Marion acknowledged on cross-examination that, in an attempt to have Avis confide in her, she had lied to Avis and told her that she was "having sex" with her boyfriend. She also acknowledged that she then asked Avis if she was also "having sex," to which Avis replied in the affirmative. Marion stated that, after "a while," Avis disclosed that it was defendant with whom she was "having sex."

[4]     Wendy acknowledged in her testimony that, during the course of her marriage, defendant would periodically "leave the marriage or go stay someplace else" but that every time she would "take him back." At trial, she specifically recalled two such occasions.

However, it was Avis's testimony that, after defendant and her mother had a "big argument" in May of 2009, she had the "instinct that he wasn't coming back."

Avis testified that, shortly after she told Marion about the sexual molestation and even though she had asked Marion not to do so, her sister nonetheless revealed Avis's allegations of sexual molestation to their mother, Wendy, who then confronted her. She further testified that Wendy was "screaming and crying and mad" and proceeded to drive her to Hasbro Children's Hospital for an examination.[5] She stated that, in the days after that, she had "a lot of mixed emotions" and that she was "crying and relieved at the same time."

### 2. The Testimony of the Sister of the Complaining Witness

Avis's older sister, Marion, testified that in March of 2009 defendant entered the bedroom which she shared with Avis and asked Marion to leave and tend to her siblings so that he could talk to Avis. Marion further testified that she wanted to hear what they were talking about and that, therefore, she listened through the bathroom wall. She stated that she heard defendant say, "Stop and be quiet." In response to a question posed to her on cross-examination, she acknowledged that she also heard "a female and a male moaning." According to Marion's testimony, defendant and Avis were in the bedroom together for "probably" longer than ten minutes; she added that, when they left the room, she observed that the bed was a "mess." Marion stated that, because of what she had heard on that occasion, she thereafter asked Avis "if anything was going on with her and [defendant]" but that Avis "kept saying no." It was Marion's testimony that, when Avis eventually disclosed that defendant had been having sexual intercourse with her, Marion then informed their mother about that disclosure.

---

[5]     As we shall discuss more fully infra, Wendy's testimony indicated that Marion revealed Avis's allegations of sexual abuse to her on July 6, 2009 and that she took Avis to Hasbro Children's Hospital in the early hours of July 8—the day of a Family Court hearing on a temporary restraining order that Wendy had sought against defendant.

### 3. The Testimony of the Mother of the Complaining Witness

Avis's mother, Wendy, testified that, on May 11, 2009,[6] she sought and obtained a temporary restraining order in Family Court against defendant due to an altercation that had occurred two days earlier in which defendant allegedly had physically abused her. She further testified that thereafter defendant moved out of the shared residence. She stated that, at that time, she told Avis that defendant was not coming back. According to Wendy's testimony, defendant subsequently filed for divorce.

In addition, Wendy denied instructing Avis or Marion or anyone else to falsely accuse defendant of child molestation; she further denied that the allegations against defendant were "working out" to her benefit in any way (specifically with respect to the Family Court proceedings) or that she was attempting to take away from defendant the children of whom they were the biological parents in order to get even with him for allegedly abusing her.

### 4. The Expert Medical Testimony

Doctor Rachel Clingenpeel was qualified by the trial justice as an expert in child abuse pediatrics. Doctor Clingenpeel testified that she was a fellow in the Child Protection Program at Hasbro Children's Hospital and that she examined Avis on July 8, 2009. It was Dr. Clingenpeel's testimony that she discussed Avis's medical history with Wendy, who told her that Avis had disclosed that "she had been sexually abused including penile * * * penetration by her stepfather." Doctor Clingenpeel explained that, in the presence of the attending physician, Dr. Amy Goldberg, she then conducted a complete "head-to-toe" physical examination of Avis.

---

[6] It will be recalled that Wendy would once again be in Family Court with respect to the restraining order against defendant on July 8, 2009. See footnote 5, supra; see also Part I.A.5, infra.

Doctor Clingenpeel testified that the files of the Child Protection Program contained a medical record for Avis stemming from a previous visit in 2001 when she was three years old.[7] Doctor Clingenpeel stated that, during that earlier visit, Dr. Goldberg had similarly conducted a complete "head-to-toe" physical examination of Avis. She added that Dr. Goldberg's report regarding the 2001 examination indicated that Avis had a "completely normal physical exam" and specifically noted that she had "ample hymenal tissue," meaning that there was "no doubt that there was a normal amount of tissue."

Doctor Clingenpeel testified that, during the examination in July of 2009, she observed that Avis had "begun the process of going through puberty." She added that, "when we see kids who have effects of puberty we expect to see a thicker more folded hymen;" she then testified that, with respect to Avis, "instead we saw very little hymen at all." Doctor Clingenpeel explained that the finding of "minimal hymenal tissue" during Avis's exam alone "would have been abnormal and concerning." She added that she would have "expect[ed] to see [that Avis] would have even more tissue there than on the previous exam [i.e., in 2001] and instead she had very minimal hymen." Doctor Clingenpeel further testified that, in her opinion (which she rendered to a reasonable degree of medical certainty), the changes in Avis's hymen between the 2001 exam and the 2009 exam "were due to penetrating vaginal trauma" by "an outside force."[8]

---

[7]     Doctor Clingenpeel testified that Avis had been examined at Hasbro Children's Hospital when she was three years old as the result of an allegation of neglect that had been received by the Department of Children, Youth, and Families. She testified that, during that visit, Dr. Goldberg, at that time a fellow in the Child Protection Program, conducted a genital examination on Avis according to standard procedure, even though Dr. Clingenpeel acknowledged that at that time there was no allegation or disclosure of sexual abuse.

[8]     The defendant testified at trial that Wendy had two vibrators, one of which "looked like the replica of a penis." He further testified that Wendy would leave both of the vibrators "in various spots in the house" to which the children had access, including the children's rooms. It was Avis's testimony that she had seen each of Wendy's vibrators.

Doctor Clingenpeel acknowledged that, in her report, she stated that "minimal hymenal tissue is concerning for chronic sexual abuse." At trial, she explained her use of the term "chronic" as follows:

> "This was not something that had happened to her in the last few days or the last week. This is something that had happened in the past and then healed. Also in our experience when we see this type of finding on a genital exam it is most consistent or likely to have been caused by multiple episodes of vaginal penetrating trauma. However, we cannot exclude that there was a single episode of severe trauma to the hymen causing this finding but it's most consistent with multiple episodes of penetrating trauma * * * ."

Doctor Clingenpeel further stated that, with respect to her opinion concerning this case, she had consulted with Dr. Goldberg, who as the attending physician signed off on all of her reports—as she did in this case.[9]

Doctor Goldberg also testified at trial, and her testimony was substantively similar to that of Dr. Clingenpeel. Doctor Goldberg stated that, during Avis's 2009 examination, she observed that Avis had "minimal hymenal tissue"—which was itself "highly, highly concerning for penetrating trauma or a history of penetrating trauma;" additionally, based on her comparison of

---

On cross-examination, defense counsel asked Dr. Clingenpeel if the change in Avis's hymen could have been caused by "some type of plastic penis." Doctor Clingenpeel replied: "In what context?" Defense counsel responded: "In the context of penetrating her vagina with some plastic penis" by "anyone" or by Avis "herself." In response, Dr. Clingenpeel then stated:

> "That's not something that children of [Avis's] age or pubertal development do because it is painful before they have gone through all of the pubertal stages and so if I heard that an 11-year-old child had indeed been putting objects into her own vagina, I would be concerned. That is very developmentally abnormal sexual behavior and that child may have * * *, in fact, been sexually abused."

[9] Doctor Clingenpeel testified that Avis had a normal anal exam. She also testified that "[t]he vast majority of children that have been sexually assaulted through anal penetration have a normal external anal exam."

Avis's two examinations, it was her expert opinion that the changes in Avis's hymen were caused by "vaginal penetration." When she explained the meaning of the statement in Avis's medical report that the results of Avis's exam were "concerning for chronic sexual abuse," Dr. Goldberg's testimony was similar to Dr. Clingenpeel's above-quoted testimony; however, Dr. Goldberg elaborated as follows: "The use of chronic also is a term that we used to suggest multiple times, that her exam was most consistent with something that had happened to her many times that there was vaginal penetration, not on one occasion but on more than one occasion, and probably more than two occasions * * * ." Doctor Goldberg further testified: "I have seen several children who had accidental trauma as well as with forced penetration with objects, different objects, one forced penetration where basically their whole hymen is taken out and their healing pattern is different." It was her testimony that she was not willing to exclude the possibility that the change in Avis's hymen was the result of "one very forceful event," but she stated that "that's not what [Avis's] history reveals at all."

### 5.     The Testimony of Defendant

The defendant, Adam Lake, testified in his own defense. He denied that he had ever touched Avis "in a sexual way" or engaged in sexual intercourse with her. According to his testimony, he had been having marital problems with Wendy since 2007. He acknowledged that, during the course of their relationship, there had been fights which became physical.

He further testified that he first learned of Avis's allegations against him on July 8, 2009 in a courthouse hallway where a hearing for a temporary restraining order involving Wendy and defendant was to be held. It was his testimony that Wendy was "screaming * * * at the top of her lungs" about what Avis said he had been doing to her. He stated that Wendy said, "You've

been raping my daughter," and that he replied, "I can't believe you're stooping this low."[10]  He also stated that Wendy then "gave [him] a smile and walked away."

## B

## The Verdict, the Motion for a New Trial, and the Sentencing

On January 10, 2012, the jury convicted defendant on Counts One and Three (both charging "penile/vaginal penetration") but acquitted him with respect to Count Two (alleging "penile/anal penetration").  Subsequently, on February 27, 2012, defendant moved for a new trial, arguing that the present case is one in which he "should have been found guilty of all three counts or not guilty of all three counts."  The defendant asserted that, in his opinion, there was no distinction in the evidence presented on each of the three counts, given that the same people, location, and type of conduct were involved in each of the charged offenses according to Avis's testimony; and, therefore, defendant suggested that "the weight of the evidence is really not strong against [him]" and that the verdict "does not do substantial justice in this case."

In due course, defendant was sentenced to two concurrent terms of forty years imprisonment, with twenty-five years to serve and the remaining fifteen years suspended, with probation.  The defendant filed a timely appeal to this Court.  On appeal, defendant challenges only the trial justice's denial of his motion for a new trial.

## II

## Analysis

On appeal, defendant contends that "the trial justice overlooked and misconceived the material evidence;" he adds that "her decision denying defendant's motion for a new trial was

---

[10]  Providence Police Detective Christopher Rotella, who accompanied Wendy to the hearing on the temporary restraining order, was called by the state in rebuttal; he testified that, when Wendy accused defendant of rape, he did not verbally respond and was "[v]ery calm, very stoic."

clearly wrong." The defendant specifically argues that the testimony of Avis, Marion, and Wendy "was so characterized by inconsistency and inherent improbability as to undermine support for the jury's verdict,"[11] whereas the witnesses for the defense were (in defendant's view) "forthright and believable." The defendant also argues that the testimony of the medical witnesses, Dr. Clingenpeel and Dr. Goldberg, "added little weight to the state's case." He further asserts that the verdicts failed to truly respond to the evidence or to do substantial justice between the parties.

In ruling on a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Rosario, 35 A.3d 938, 947 (R.I. 2012) (internal quotation marks omitted); see also State v. Baker, 79 A.3d 1267, 1273 (R.I. 2013); State v. Paola, 59 A.3d 99, 104 (R.I. 2013); State v. Guerra, 12 A.3d 759, 765 (R.I. 2011). In fulfilling his or her role as the thirteenth juror, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Espinal, 943 A.2d 1052, 1058 (R.I. 2008) (internal quotation marks omitted); see

_____

[11] The defendant questions several aspects of Avis's testimony. For example, defendant takes issue with her lack of memory with respect to the details of the charged incidents, including whether defendant was using crutches (as defendant alleges he was) during the time frame in which the incidents that were the basis for Counts One and Two allegedly occurred. The defendant questions the credibility of Avis's testimony with respect to those counts because, although Avis testified at trial that defendant had sexually molested her when he was "on crutches" (which contradicted her testimony at defendant's bail hearing), she did not specifically mention that detail in her testimony with respect to either Count One or Two. Additionally, defendant states that "it defies belief" that Avis would not have cried out during the first incident of sexual molestation that was the basis for Count One given her testimony that all of her siblings were home at that time. It is clear from the record, however, that in ruling on the motion for a new trial, the trial justice took into account these and other contentions by defendant about the credibility of Avis and in the end concluded that the essence of her testimony was credible. See generally State v. Jensen, 40 A.3d 771, 781 (R.I. 2012).

- 11 -

also State v. Mitchell, 80 A.3d 19, 30 (R.I. 2013); State v. Morales, 895 A.2d 114, 121 (R.I. 2006). If, after carrying out this three-step analytical process, "the trial justice agrees with the jury's verdict or determines that reasonable minds could differ, then the analysis is complete and the verdict should be affirmed." State v. Harrison, 66 A.3d 432, 445 (R.I. 2013) (internal quotation marks omitted); see also State v. Kizekai, 19 A.3d 583, 590 (R.I. 2011). On the other hand, if the trial justice "does not agree with the verdict or does not agree that reasonable minds could differ, then the trial justice must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." Harrison, 66 A.3d at 445 (internal quotation marks omitted).

With respect to trial court rulings on motions for a new trial, we have stated that the "record should reflect a few sentences of the justice's reasoning on each point." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (internal quotation marks omitted). However, we have also indicated that "[i]n providing a rationale for a decision * * * the trial justice need * * * only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." Id. (internal quotation marks omitted).

"On review, we accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." Espinal, 943 A.2d at 1058; see also State v. Day, 925 A.2d 962, 983-84 (R.I. 2007). Accordingly, this Court will not disturb a trial justice's decision with respect to such a motion "unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." DiCarlo, 987 A.2d at 871 (internal quotation marks omitted); see also Harrison, 66 A.3d at 445. In reviewing a denial of a motion for a new trial, "we do not focus on whether this Court simply agrees or disagrees with the trial justice's

credibility determinations," but rather we are "deferential to those determinations;" and "we will not overturn that decision unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong." State v. Clay, 79 A.3d 832, 842 (R.I. 2013) (internal quotation marks omitted). We have repeatedly noted that "[t]his Court affords a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." Paola, 59 A.3d at 106 (internal quotation marks omitted); see also DiCarlo, 987 A.2d at 872.

The record clearly indicates that the trial justice made comprehensive findings which served as the basis for her denial of defendant's motion for a new trial. In ruling on defendant's motion, the trial justice performed the required three-step analysis. See Rosario, 35 A.3d at 947. The trial justice first considered the evidence in light of the charge to the jury, noting that defendant was convicted of the two counts of first-degree child molestation sexual assault alleging "penile/vaginal penetration," but was acquitted of the count which charged him with "penile/anal penetration." She then, in accordance with the second required step, meticulously reviewed and summarized the testimony of the key witnesses at trial, weighing the evidence and assessing the credibility of those witnesses. Notably, it was her determination that "the crux of the case, given the nature of the charges, was the testimony of the complaining witness herself," and the trial justice manifested no hesitation as to the credibility of that witness.

As was incumbent upon her in her role as the thirteenth juror, the trial justice made the following assessment of credibility:

> "[Avis's] testimony about the two incidents that were the subject
> of the jury's verdicts in Count's [sic] one and three was very

credible. While she could not recall exact times and dates or her * * * age * * * at the time of the incident, she was quite clear that they happened in the way she described."

The record also reflects that the trial justice carefully considered not only the consistencies but the alleged inconsistencies in Avis's testimony as well; the trial justice stated that "[a]ny confusion or lack of detail on [Avis's] part could well be explained by the number of times she testified she was sexually abused by the defendant * * * ." Significantly, the trial justice found that "[i]n this Court's judgment the credible testimony alone of [Avis] as to Counts one and three is sufficient to, in and of itself, sustain the jury's verdicts."

Upon concluding her analysis, the trial justice stated: "When all of this testimony and evidence is considered, reasonable fact-finders could have found as I found the defendant guilty of Counts one and three of the indictment beyond a reasonable doubt." In accordance with the well-established principles in this domain, the trial justice proceeded to deny defendant's motion for a new trial. See Guerra, 12 A.3d at 765 (stating that if, after conducting the required three-step analysis, the trial justice agrees with the jury's verdict, "then the inquiry is at an end and the motion for a new trial should be denied"); see also State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012).

After carefully reviewing the record in this case, it is clear to us that defendant's various arguments on appeal essentially amount to little more than a disagreement with the trial justice's assessment of the credibility of the witnesses and the weight of the evidence. See State v. Gonzalez, 56 A.3d 96, 103 (R.I. 2012) (stating that "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial") (internal quotation marks omitted); see also State v. Ferreira, 21 A.3d 355, 367 (R.I. 2011). As we have stated on multiple occasions, "the presence of some

- 14 -

inconsistencies between or among utterances of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief." State v. Jensen, 40 A.3d 771, 781 (R.I. 2012); see also Rosario, 35 A.3d at 948–49; State v. Shepard, 33 A.3d 158, 164 (R.I. 2011); State v. Cerda, 957 A.2d 382, 386 (R.I. 2008).

This Court's confidence in the trial justice's denial of defendant's new trial motion is reinforced by the medical testimony that was presented in the instant case. It is clear that the trial justice credited the testimony of both Dr. Clingenpeel and Dr. Goldberg that the change in Avis's hymen between the 2001 and the 2009 examinations was, in Dr. Clingenpeel's words, "most consistent or likely to have been caused by multiple episodes of vaginal penetrating trauma." It is our determination that the trial justice quite understandably found that, with respect to the two incidents of sexual abuse charged in Counts One and Three, the medical testimony "was credible and weighty as corroborative evidence to the credible testimony of [Avis]."

Additionally, it is noteworthy that the jury acquitted defendant of the second count in the indictment. That acquittal constitutes a basis for inferring that the jury took its responsibility seriously and thoughtfully and conscientiously considered the facts and the credibility of the witnesses in light of the jury charge before rendering its verdict. Cf. State v. Rivera, 987 A.2d 887, 901 (R.I. 2010) (stating that "the jury's thoughtfulness in its consideration of the facts and credibility of the witnesses * * * may be inferred from [the] defendant's conviction on one count of a lesser-included offense"). The trial justice noted that, although she found Avis's testimony to be credible with respect to Count Two, the testimony and the evidence presented relative to Count Two were "not of the same weight as that connected with Counts one and three;" in our judgment, the trial justice wisely acknowledged that the jury's acquittal of defendant on Count

Two did not undermine the guilty verdicts in view of the differences in the evidence presented with respect to Count Two in comparison to Counts One and Three.

We are satisfied that the trial justice conducted the proper analysis in ruling on the defendant's motion for a new trial. Nothing in the record leads us to conclude that the trial justice was either clearly wrong or that she overlooked or misconceived material and relevant evidence in her denial of the defendant's motion for a new trial. See Clay, 79 A.3d at 842; Gonzalez, 56 A.3d at 103. Accordingly, it is our judgment that the trial justice properly denied the defendant's motion for a new trial.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**          State v. Adam Lake.

**CASE NO:**          No. 2012-254-C.A.
                                       (P1/09-2645A)

**COURT:**          Supreme Court

**DATE OPINION FILED:**          May 16, 2014

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**          Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                                   Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

                                   For State:  Aaron L. Weisman
                                                       Department of Attorney General

                                   For Defendant:  Janice M. Weisfeld
                                                       Office of the Public Defender