**Supreme Court**

No. 2013-365-C.A.

(P1/04-3981CG)

State                                    :

    v.                                   :

Ramon Virola.                            :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| Ramon Virola. | : | |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** The defendant, Ramon Virola, appeals to this Court from a "Judgment of Conviction and Commitment"[1] dated July 3, 2013, which was entered after a jury found him guilty of four criminal counts related to a murder committed during the course of an attempted robbery. On appeal, the defendant contends that the trial justice erred in denying his motion for a new trial and in admitting certain witness testimony. Specifically, he posits that the testimony of three of the key witnesses at trial—David Mercado, Martin "Malik" White, and Patricia "Vicky" Gallardo—was not credible. The defendant further argues that the trial justice erred in admitting certain testimony by Ms. Gallardo because the testimony was not relevant and, even if it were relevant, the unfairly prejudicial nature of that testimony greatly outweighed its probative value, in violation of Rule 403 of the Rhode Island Rules of Evidence.

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction and its denial of defendant's motion for a new trial.

---

[1] Some of the documents referenced in this Court's discussion have headings which use all capital letters, are underlined, or employ bold-face type. We have conformed those headings to our usual style throughout this opinion.

# I

## Facts and Travel

On August 16, 2004, Christopher Nelson, a graduate of Johnson & Wales University, was shot in his second floor apartment on Knight Street in Providence and died as a result. Following an investigation of the murder, the Providence Police Department eventually took four men into custody—David Mercado, Lazaro "Casper" Martinez, Martin "Malik" White, and Wayman "Kevin" Turner. The police also issued an arrest warrant for defendant. Mr. Mercado subsequently entered into a cooperation agreement with the state; and, on December 8, 2004, he pled nolo contendere to one count of conspiracy to commit robbery.

Thereafter, on December 10, 2004, a Providence County grand jury indicted defendant, as well as Mr. Martinez, Mr. White, and Mr. Turner for the murder of Christopher Nelson, in violation of G.L. 1956 § 11-23-1 and § 11-23-2. They were also indicted for assault with intent to commit robbery, in violation of G.L. 1956 § 11-5-1; conspiracy to commit robbery, in violation of G.L. 1956 § 11-1-6 and G.L. 1956 § 11-39-1(a); and discharge of a firearm during a crime of violence, in violation of G.L. 1956 § 11-47-3.2(b)(3).

Mr. Martinez, Mr. White, and Mr. Turner all had the criminal charges against them disposed of in due course.[2] However, defendant was not apprehended for approximately seven

---

[2]    On November 14, 2005, Lazaro Martinez plead nolo contendere to second degree murder in violation of G.L. 1956 § 11-23-1 and conspiracy to commit robbery in violation of G.L. 1956 § 11-1-6. In exchange, the remaining counts in the indictment against him were dismissed in accordance with Rule 48(a) of the Superior Court Rules of Criminal Procedure. Mr. Martinez was eventually sentenced to fifty years to serve with twenty years suspended and twenty years of probation on the second degree murder count; he was sentenced to ten years to serve on the conspiracy to commit robbery count, to be served concurrently. On April 25, 2006, Wayman Turner's plea of guilty to second degree murder and conspiracy to commit the crime of robbery was filed. Mr. Turner also had the remaining charges against him dropped pursuant to Rule 48(a). Mr. Turner was sentenced to life on the second degree murder count and ten years to

years.  It was not until November 16, 2011 that defendant was arrested in Glendale, Arizona, where he was known by the name "Benny Delgado."  Subsequent to his arrest, on December 5, 2011, defendant was presented with a notice that the state would seek to have him adjudged as a habitual criminal, pursuant to G.L. 1956 § 12-19-21.[3]

In February and March of 2013, a jury trial was held in Providence County Superior Court.  We summarize below the salient aspects of what transpired at that trial.

## A

### The Testimony at Trial

### 1.  The Testimony of Floyd Johnson

Floyd Johnson, who was present at the time of the attempted robbery, testified at trial for the prosecution.  Mr. Johnson, who testified that he had been a friend of the decedent, Christopher Nelson, testified that on August 16, 2004, Mr. Johnson, Mr. Nelson, and two mutual friends, Courtenay Penn and Jerel James, were watching the Olympics on television and playing video games in Mr. Nelson's second floor Knight Street apartment in Providence.  Mr. Johnson testified that, after hearing a knock on the door, Mr. Nelson answered the door, but then appeared to be "trying to close the door" as he "struggle[d]" with someone.  It was the testimony of Mr. Johnson that an intruder wearing a mask then stepped into the room, pointed a gun at Mr. Nelson, and repeatedly asked: "Where is the money?"  Mr. Johnson stated that, after Mr. Nelson

---

serve on the conspiracy to commit robbery count, to be served concurrently.  Martin White's plea and sentencing are discussed infra.

[3]     The defendant was also an alleged probation violator, pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure.  The alleged probation violation was heard at trial, in conjunction with the other criminal allegations, but the witnesses from the Department of Probation testified outside the presence of the jury.  Although the trial justice ultimately determined that defendant was a probation violator, defendant did not appeal that finding of violation.

replied that he did not have any money, "the gun went off[.]" According to Mr. Johnson, the intruder was then "brandishing" the gun in the "general direction" of him, Mr. Penn, and Mr. James, again demanding to know where the money was. Mr. Johnson testified that, after he, Mr. Penn, and Mr. James stated that they did not have any money and did not live at the apartment, the intruder left. It was the testimony of Mr. Johnson that during the encounter he saw Mr. Nelson "leaning on the fridge" and "holding his chest." He further stated that, after the intruder left, he, Mr. Penn, and Mr. James called for help and attempted to assist Mr. Nelson. It is undisputed that, although rescue services were called and arrived soon thereafter, Mr. Nelson was later pronounced dead.

### 2. The Testimony of Christina Stanley, M.D.

Doctor Christina Stanley, the Chief Medical Examiner for the State of Rhode Island, testified at trial for the state. Doctor Stanley testified that the autopsy of Mr. Nelson had been performed by assistant medical examiner Dr. Dorota Latuszynski, and Dr. Stanley acknowledged that Dr. Latuszynski was no longer employed by the Rhode Island Medical Examiner's Office. Doctor Stanley stated that Dr. Latuszynski had concluded that Mr. Nelson had "died of internal hemorrhage due to injuries of the heart, aorta, and left lung" caused by a "single gunshot wound that perforated his chest." It was her testimony that Mr. Nelson's death was a homicide.

### 3. The Testimony of David Mercado

David Mercado, one of the accomplices in the attempted robbery and the murder of Mr. Nelson, testified at trial pursuant to a cooperation agreement, in which he agreed to assist in the murder investigation and to testify for the state. Mr. Mercado testified that, in exchange for his testimony, he pled nolo contendere to one count of conspiracy to commit robbery and received a ten year sentence, with four years to serve and the balance suspended with probation.

With respect to the events leading up to the murder of Mr. Nelson, Mr. Mercado testified that, on August 16, 2004, the day of Mr. Nelson's murder, Mr. Mercado's childhood friend Casper Martinez discussed with him a plan to rob Mr. Mercado's former drug dealer, Jeff Keltz. It was Mr. Mercado's testimony that Jeff Keltz was the roommate of Mr. Nelson. He stated that Mr. Nelson was not involved in Mr. Keltz's drug activity; that fact is undisputed by the parties. Mr. Mercado testified that, after Mr. Martinez taunted him about his reluctance to participate in the robbery, he agreed to provide transportation to and from the crime scene.

It was further the testimony of Mr. Mercado that, later that night, before the robbery, he drove Mr. Martinez to Almy Street in Providence. Mr. Mercado stated that, while they were parked on Almy Street, he observed three men, whom Mr. Mercado had never seen before, arrive on Almy Street. According to Mr. Mercado, Mr. Martinez introduced two of the men as "Malik" and "Kev." It is undisputed that the men who were introduced to Mr. Mercado as "Malik" and "Kev" were Mr. White and Mr. Turner, respectively. Mr. Mercado testified that the third man, whom Mr. Mercado later identified at trial as defendant, introduced himself to Mr. Mercado as "R." Mr. Mercado stated that he also heard Mr. Turner refer to defendant as "Ray." It was the further testimony of Mr. Mercado that, after lingering on Almy Street for ten to fifteen minutes, he drove Mr. Martinez to the corner of Penn and Knight Streets while Mr. White, Mr. Turner, and defendant drove separately to Penn Street in Mr. White's vehicle. Mr. Mercado testified that he drove away as the other four men started walking toward the apartment of Mr. Keltz and Mr. Nelson.

It was next Mr. Mercado's testimony that, after approximately ten to fifteen minutes, Mr. Martinez called to ask Mr. Mercado to pick him up near the Knight Street apartment. Mr. Mercado further testified that, once Mr. Martinez was in the car, he told Mr. Mercado that,

"Kevin [Turner] shot a guy." Mr. Mercado stated that he eventually drove Mr. Martinez home and then went "home to [his] mom's."

Mr. Mercado went on to testify that, the next day—August 17, 2004—he learned from a news broadcast that Mr. Nelson had died. It was then Mr. Mercado's testimony that, after he learned that Mr. Nelson had been killed, he drove Mr. Martinez to meet with Mr. Turner on Almy Street and that Mr. Turner gave Mr. Martinez the gun, telling Mr. Martinez to dispose of the weapon.

It was Mr. Mercado's testimony that, two days later, on August 19, 2004, in an attempt to potentially dispose of the gun in Pawtucket, he was driving with Mr. Martinez while the gun was in a shoebox on the floor of the front passenger seat. However, Mr. Mercado further testified that, while he and Mr. Martinez were en route to Pawtucket, the police pulled his car over, arrested them, and seized the weapon.

Mr. Mercado admitted during his testimony that, while he had initially denied involvement in the crime, he eventually gave a statement implicating defendant, Mr. Martinez, Mr. White, Mr. Turner, and himself in the murder of Mr. Nelson. Additionally, Mr. Mercado testified that police detectives showed him several photographic arrays from which he identified his accomplices.

On cross-examination, Mr. Mercado admitted that he had smoked marijuana multiple times on August 16, 2004, the day of Mr. Nelson's murder, and that he was "stoned" during the planning and execution of the crime. Mr. Mercado further admitted that he had smoked marijuana on the day of his arrest. He acknowledged that he decided to cooperate with the police while he was being transported to the Providence police station, when the effects of the marijuana that he had smoked earlier that day had "pretty much worn off."

#### 4. The Testimony of Martin "Malik" White

Like Mr. Mercado, Martin "Malik" White, another one of the accomplices in the attempted robbery and the murder of Mr. Nelson, testified at trial pursuant to a cooperation agreement with the state. In return for agreeing to testify for the state, Mr. White pled guilty to charges of assault with intent to commit robbery and conspiracy to commit robbery. He was sentenced to twenty years on the assault charge with fifteen years to serve, the balance suspended with probation, and he was given a ten-year suspended sentence with ten years of probation on the conspiracy charge, to be served consecutively.

Mr. White testified that, on August 16, 2004, Mr. Turner, whom Mr. White had known for approximately twenty years, called to tell him about a "lick" that was planned for later that day. Mr. White explained in his testimony that he understood a "lick" to mean a robbery. He then testified that Mr. Turner had learned of the planned robbery from Mr. Martinez. According to the testimony of Mr. White, he next met with Mr. Turner and Mr. Martinez later that day at Mr. Turner's house on Almy Street to further discuss the robbery. He stated that the group decided that they needed a weapon for the robbery, and he volunteered to attempt to acquire one.

It was then Mr. White's testimony that he called defendant in an attempt to obtain a gun for the planned robbery. He stated that he then drove Mr. Turner and defendant to a rendezvous with an unidentified individual. Mr. White testified that at that rendezvous Mr. Turner and defendant obtained a "silver" "automatic" weapon from the unidentified individual, who was in a dark-colored SUV.

With respect to the actual attempted robbery, Mr. White testified that, when the group of men eventually arrived at the Knight Street apartment, Mr. Turner, followed by defendant and Mr. White, entered the building through the back entrance. According to the testimony of Mr.

White, Mr. Turner, who was wearing gloves as well as a brown "mask" composed of "a sock or some kind of nylon," went up the stairs to the second floor of the building while Mr. White and defendant remained at the bottom of the stairs. Mr. White testified that he witnessed Mr. Turner knock on the door and that he heard the door open. He stated that, before the door opened fully, he heard a "scuffle." He also stated that he then heard a gunshot. It was Mr. White's testimony that, after the gunshot, he saw Mr. Turner exit the apartment and that he, Mr. Turner, and defendant all ran back to Mr. White's car and fled the scene.

Mr. White stated that he eventually surrendered to the police because he "knew the police were looking for [him]." He also stated that he learned that Mr. Turner had implicated him in the attempted robbery and the murder of Mr. Nelson. It was Mr. White's further testimony that, after he was indicted for the murder of Mr. Nelson, among other charges, he entered into the previously mentioned cooperation agreement with the state.

During cross-examination, Mr. White conceded that, when he gave his statement to the police, he was aware of the contents of Mr. Mercado's earlier statement to police implicating defendant, Mr. Martinez, Mr. Turner, and Mr. White himself in the attempted robbery and the murder of Mr. Nelson. Mr. White also conceded that, "in order to get the best deal," he had to "give consistent information to that which [Mr.] Mercado had provided."

### 5. The Testimony of Detective Sergeant Michael Sweeney

Detective Sergeant Michael Sweeney testified for the prosecution that, in 2004, he was a member of the Providence Police Department investigating the murder of Christopher Nelson. Detective Sweeney further testified that he drafted an arrest warrant for defendant. It was then his testimony that, after being unable to locate the defendant for several weeks, he contacted the Rhode Island State Police, who had "a fugitive task force that strictly searches for individuals

that are wanted for a period of time * * *." Detective Sweeney stated that he provided the "fugitive task force" with defendant's "identifying information" and "photographs."

### 6. The Testimony of Patricia "Vicky" Gallardo

Patricia "Vicky" Gallardo testified at trial for the state with respect to her relationship with defendant while he was living in Arizona as "Benny Delgado." Ms. Gallardo stated that, in 2008, she met defendant through an "online dating service" called "Mocospace." Ms. Gallardo testified that, during their online conversations, defendant told her that his name was "Benny;" she further testified that she later learned that his last name was "Delgado." Ms. Gallardo stated that she eventually began a romantic relationship with defendant. It was her testimony, however, that by 2009 she had temporarily ended her romantic relationship with defendant because he "kind of became controlling." She specified that defendant "wanted to know everything [she] was doing" and "who [she] was talking to." She also added that defendant "would not let [her]" take his photograph.

Ms. Gallardo testified that she resumed her romantic relationship with defendant a few months after the above-referenced hiatus, around the time when she discovered that she was pregnant with their child. Ms. Gallardo stated that, when she was four months pregnant, she moved into the house defendant was already sharing with a roommate and his roommate's family in Glendale, Arizona. According to Ms. Gallardo, during this time, she overheard defendant identify himself as "Ray" during phone calls.

Ms. Gallardo testified that she and defendant eventually moved into a rented house in a gated community in the Glendale area shortly before the birth of their son Aaron[4] in January of

---

[4]     In order to respect the privacy of the child and of Ms. Gallardo's subsequent significant other (see infra), we have used pseudonyms in referring to them. For the same reason, we have omitted their surnames. In doing so, we intend no disrespect.

2010. Ms. Gallardo stated that, a year later, in January of 2011, she learned that defendant's first name was "Ramon" and that he was "wanted" by law enforcement authorities in Rhode Island. Ms. Gallardo indicated that, when she confronted defendant with that information, he initially denied the allegations in their entirety.

It was the subsequent testimony of Ms. Gallardo that, in the Spring of 2011, her relationship with defendant deteriorated due to the fact that she considered him to be "controlling, possessive, [and] obsessive." She testified that, when she confronted defendant about his controlling behavior, he blamed his actions on being "wanted" by law enforcement. According to Ms. Gallardo, in June of 2011, she and defendant ended their romantic relationship and defendant moved out of their house in the Glendale area. Ms. Gallardo stated that, after defendant moved out, she found an envelope of documents among his belongings and that one of those documents bore the name "Ramon Virola." She added that, when she told defendant that she had those documents, he asked her to give them back. Ms. Gallardo testified that, after she refused to give them back, he offered to pay her money in exchange for their return. However, Ms. Gallardo stated that she refused defendant's offer and eventually lost the documents when she moved out of the house in the Glendale area shortly thereafter.

It was next Ms. Gallardo's testimony that she moved to Chino Valley, Arizona, with her son and her new significant other, Alice.[5] She stated that she specifically did not tell defendant where she was moving. Nonetheless, Ms. Gallardo further testified that, in November of 2011, she came to believe that defendant knew where she was living. It was her testimony that, in that month, defendant sent her a text message stating that he "knew where [she] was" and that "he was coming;" according to Ms. Gallardo, defendant included a photograph of a "highway sign,"

---

[5]     See footnote 4, supra.

which sign she testified she recognized. It was her testimony that the "highway sign" read "Prescott, Arizona. Chino Valley." It was the further testimony of Ms. Gallardo that she was "really, really scared;" she added that, consequently, she contacted the Chino Valley Police Department and told the police that defendant was wanted by law enforcement in Rhode Island. Ms. Gallardo stated that she was then contacted by United States Marshals, and she eventually learned that defendant had been apprehended.

On cross-examination, defense counsel questioned Ms. Gallardo as to why she had not moved out of the rented home which she shared with defendant sooner if, in the words of defense counsel, defendant "was preventing [Ms. Gallardo] from being independent and enjoying [her] own life * * *." Ms. Gallardo answered that she "wasn't allowed" to move out because defendant "blackmailed [her]." Ms. Gallardo further stated that she continued to live with defendant because she felt that she "didn't have a choice." Additionally, in response to defense counsel's questioning, Ms. Gallardo stated that she had met her then-current significant other, Alice, in 2011, "[a] little bit before the incident of where he -- where it got physical." Ms. Gallardo went on to state that defendant "moved out after he got physical with [her]."

On redirect examination, Ms. Gallardo clarified that defendant had struck her and that his striking her was what caused both the end of their relationship and defendant's move out of their home in the Glendale area. She further stated that, after defendant had moved out but before she moved out, she returned to the home one day to find that much of her property had been vandalized.

### 7. The Testimony of Officer Jimmy Carlo

Jimmy Carlo, a police officer with the City of Glendale, testified for the state that, on November 16, 2011, he participated in the arrest of defendant in Phoenix. Officer Carlo stated

that, at the time of his arrest, defendant was carrying a driver's license which bore the name "Benny Delgado Martinez." Officer Carlo testified that defendant initially denied that he was Ramon Virola. However, Officer Carlo stated that, once he told defendant that "he was going to get fingerprinted," which would reveal his identity, defendant said: "'You know who I am.'"

## B

### The Jury Verdict and Subsequent Motion for a New Trial

After the state rested, defendant opted to rest without calling any witnesses. On March 6, 2013, after approximately two hours of deliberation, the jury found defendant guilty of all four counts of the indictment, including the first degree felony murder of Mr. Nelson.[6] Subsequently, defendant moved for a new trial; defendant argued that, Mr. Mercado, Mr. White, and Ms. Gallardo were, in his view, all "compromised witnesses," and that, therefore, the court should refuse to credit their testimony; defendant consequently requested that "the [c]ourt grant the motion for a new trial in the interest of justice * * *." On April 23, 2013, the trial justice denied the motion. The defendant filed a timely appeal to this Court.

## II

### Issues on Appeal

On appeal, defendant contends: (1) that, in denying his motion for a new trial, the trial justice inappropriately credited the testimony of Mr. Mercado, Mr. White, and Ms. Gallardo; and (2) that the trial justice erred in permitting Ms. Gallardo to testify as to defendant's purportedly "controlling" behavior during their romantic relationship.

---

[6] After the jury found defendant guilty of the four criminal counts referenced in the text, supra, defendant thereafter entered a plea of guilty to the charge of being a habitual criminal. See G.L. 1956 § 12-19-21.

# III

## Analysis

### A

### Defendant's Motion for a New Trial

### 1. Standard of Review [7]

As we have repeatedly stated, "[w]e accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." State v. Hie, 93 A.3d 963, 975 (R.I. 2014) (internal quotation marks omitted); see State v. Lake, 90 A.3d 186, 193 (R.I. 2014); see also State v. Day, 925 A.2d 962, 983-84 (R.I. 2007). As such, we shall not disturb a trial justice's decision on a motion for a new trial "unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." State v. DiCarlo, 987 A.2d 867, 871 (R.I. 2010) (internal quotation marks omitted); see State v. Payette, 38 A.3d 1120, 1127 (R.I. 2012); see also State v. Harrison, 66 A.3d 432, 445 (R.I. 2013). When reviewing a trial justice's denial of a motion for a new trial, "we do not focus on whether this Court simply agrees or

---

[7] It is important to note that, in addition to arguing that the verdict was against the weight of the evidence, defendant states that the testimony at trial was "legally insufficient to support a verdict of guilt * * *." This Court has explained that there are important differences between a motion for a new trial based on the insufficiency of the evidence and a motion for a new trial based on the weight of the evidence. See State v. Clark, 974 A.2d 558, 569-71 (R.I. 2009); see also State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011). However, the just-quoted statement by defendant is his only reference to a motion for a new trial based upon the insufficiency of the evidence. Moreover, he proceeds to provide the Court with only the standard of review relevant to a motion for a new trial based on the weight of the evidence. Accordingly, this Court deems any argument regarding the sufficiency of the evidence waived and will focus solely on whether the trial justice properly denied defendant's motion for a new trial based upon the weight of the evidence. See Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I. 2002) ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."); see also Horton v. Portsmouth Police Department, 22 A.3d 1115, 1130 (R.I. 2011); State v. Chase, 9 A.3d 1248, 1256 (R.I. 2010).

disagrees with the trial justice's credibility determinations," but rather we are "deferential to those determinations[;] * * * we will not overturn that decision unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong." State v. Clay, 79 A.3d 832, 842 (R.I. 2013) (internal quotation marks omitted); see also Hie, 93 A.3d at 975. Especially relevant to the instant case, we note that "[t]his Court affords a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." State v. Paola, 59 A.3d 99, 106 (R.I. 2013) (emphasis added) (internal quotation marks omitted); see State v. Kizekai, 19 A.3d 583, 589 (R.I. 2011); see also DiCarlo, 987 A.2d at 872.

When ruling on a motion for a new trial, the trial justice sits in the role of the metaphorical "thirteenth juror;" and, in that role, the trial justice must "exercise[] independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Barrios, 88 A.3d 1123, 1128 (R.I. 2014) (internal quotation marks omitted); see also State v. Baker, 79 A.3d 1267, 1273 (R.I. 2013); State v. Rosario, 35 A.3d 938, 947 (R.I. 2012); State v. Guerra, 12 A.3d 759, 765 (R.I. 2011). We have repeatedly recognized that "[i]n fulfilling his or her role as the thirteenth juror and passing on a motion for a new trial, the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Hie, 93 A.3d at 974 (internal quotation marks omitted); see also State v. Silva, 84 A.3d 411, 416 (R.I. 2014); State v. Mitchell, 80 A.3d 19, 30 (R.I. 2013); State v. Espinal, 943 A.2d 1052, 1058 (R.I. 2008). After carrying out this three-step

analytical process, if "the trial justice agrees with the jury's verdict or determines that reasonable minds could differ, then the analysis is complete and the verdict should be affirmed." Harrison, 66 A.3d at 445 (internal quotation marks omitted); see also State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012); Kizekai, 19 A.3d at 590. However, if the trial justice "does not agree with the verdict or does not agree that reasonable minds could differ, then the trial justice must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." Lake, 90 A.3d at 193 (internal quotation marks omitted); see Harrison, 66 A.3d at 445.

We have stated that, when ruling on a motion for a new trial, the "record should reflect a few sentences of the justice's reasoning on each point." Rosario, 35 A.3d at 947 (internal quotation marks omitted); see also Silva, 84 A.3d at 417. Nonetheless, we continually apply the principle that, in providing the rationale for his or her decision, a trial justice need not "refer to all the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." State v. Robat, 49 A.3d 58, 71 (R.I. 2012) (emphasis in original) (internal quotation marks omitted); see also DiCarlo, 987 A.2d at 870.

### 2. Discussion

Mr. Virola contends that the trial justice erred in denying his motion for a new trial "because Patricia Gallardo, David Mercado and Martin White were all biased witnesses with motivation to lie * * *." With respect to Ms. Gallardo, he argues that "[i]t was clearly in her interest to do anything to make sure Virola never again saw the light of day, as he was the one impediment to her enjoying the rest of her life with [Alice] and [Aaron]." As for Mr. Mercado's testimony, defendant avers that Mr. Mercado's testimony was not credible for two reasons: (1) the fact that Mr. Mercado entered into a cooperation agreement with the state in exchange for a

- 15 -

particularly light sentence; and (2) the fact that Mr. Mercado admitted to repeatedly using marijuana on the day of the robbery and, according to defendant, being "stoned at the time of the commission of the crime." Moreover, defendant states that Mr. Mercado's testimony was also unreliable because he initially lied to the police about his own involvement in the crime and was "coming off the effects of marijuana" when he finally told the police about the crime and identified the other individuals involved, including defendant. Lastly, when addressing Mr. White's testimony, defendant claims that it too was unworthy of credence because Mr. White entered into a cooperation agreement with the state. Moreover, according to defendant, Mr. White had access to all of the discovery in the case, including Mr. Mercado's statement, before making his statement to police; defendant posits that it was in Mr. White's best interest to be sure his statement matched the other evidence and accounts of the crime. Thus, it is defendant's overall contention that "[n]one of these witnesses were worthy of belief."

Our review begins by analyzing the decision of the trial justice to determine whether he followed the proper procedure in addressing defendant's motion for a new trial. The trial justice began with the first step in a new trial analysis and analyzed the evidence in light of the jury charge. After detailing the jury charge, the trial justice then discussed the fact that the state had called twelve witnesses, and he added that the state had never set out to prove that defendant personally shot Mr. Nelson; rather, it was the trial justice's observation that "[w]hat the State intended, and what the proof of the State targeted, was to prove that Defendant Virola was vicariously responsible for the offenses, either as a co-conspirator or as an aider and abettor." The trial justice stated that there was "no question that the State easily proved that a felony murder was committed during the course of the attempted robbery." Moreover, he noted that

- 16 -

there was also "no question that the State easily proved that a conspiracy was afoot in connection with these individuals to commit that robbery."

Next, the trial justice moved on to the second step in the analytical process relative to a motion for a new trial and independently assessed the credibility of the witnesses and the weight of the evidence. With respect to the three above-referenced witnesses, it was the opinion of the trial justice that "[t]heir credibility was severely tested by cross-examination, and all of their warts and wrinkles were clearly exposed." He proceeded to state:

> "It's clear * * * that this jury accepted the testimony of all three [of the witnesses at issue]. The credibility issues are, after all, quintessentially entrusted to jurors. I cannot at all fault the jurors for having found all three of these witnesses credible. As a front-row observer, I did too. Frankly, the testimony of [Mr.] White and [Mr.] Mercado was sufficient and credible by itself to convict the defendant.
> "When one adds to that Vicky Gallardo's testimony, there simply was no way that this defendant was going to escape conviction[;] * * * and his later acknowledgment to Vicky that, 'I am the way I am because I'm wanted,' was damning evidence indeed."

The trial justice went on to discuss the fact that evidence of defendant's flight and living under an assumed name was admissible as evidence of "consciousness of guilt."

Finally, moving on to the third step in the new trial analysis, the trial justice concluded as follows:

> "There is no question in my mind that Defendant Ramon Virola, aka Benny Delgado, was a key participant in this fatal escapade that resulted in the shooting death of Christopher Nelson. In fact, from the credible evidence before me, it was Defendant Virola who orchestrated obtaining the pistol that ultimately caused Mr. Nelson's death. The evidence against Mr. Virola was indeed overwhelming.
> "The jury's verdict, which was returned with alacrity, is not a reflection of their giving short shrift to defendant's interests in this case. Rather, it is a testament to the mountainous credible

> evidence that proved Virola's guilt beyond a reasonable doubt on all counts."

Thus, the trial justice agreed with the jury's verdict and, consequently, denied defendant's motion for a new trial. See State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007) ("If the trial justice concludes that he or she would have reached the same result as the jury did or that reasonable minds could differ as to the result, the motion for a new trial must be denied.").

On appeal, defendant is essentially asking this Court to second-guess the credibility determinations of the trial justice. The defendant points specifically to the following: (1) the fact that Ms. Gallardo had reason to want defendant out of her life and that of her son; (2) the fact that Mr. Mercado testified in exchange for a light sentence and was under the influence of marijuana when the crime occurred; and (3) the fact that, according to defendant, it was in Mr. White's best interest to make a statement consistent with that of Mr. Mercado. However, as the trial justice aptly noted, all of those facts about the witnesses were known to the jury.

Ms. Gallardo acknowledged that she considered defendant to be a "bad guy," but she also testified to the fact that defendant loved his son and provided for both her and Aaron during the time when she was living with defendant; she stated that she stayed with defendant despite his "possessive" behavior and did not seek help from the police or family. She further testified that she went to the police about defendant only after she and Aaron had moved in with her new significant other in Chino Valley. In fact, on cross-examination, she acknowledged that she just "wanted [defendant] to stay * * * far away from [her] happy family that [she was] developing." Thus, the jury was aware of the alleged credibility issues with respect to Ms. Gallardo's testimony that defendant raises on appeal.

Likewise, the jury was aware of the facts that defendant raises on appeal that weigh against Mr. Mercado being found to be a credible witness. Mr. Mercado testified that he had

smoked marijuana multiple times on the day of the crime and was "stoned" at the time the crime took place. Moreover, he acknowledged in his testimony that, when he gave his statement to the police and identified defendant as a participant in the crimes at issue, he was, in defendant's words, "coming off the effects of marijuana." Additionally, not only did Mr. Mercado testify regarding his agreement with the state and regarding the relatively lenient sentence that he received, but also, on direct examination, the prosecutor took him through that agreement paragraph by paragraph, asking whether he had agreed to each "paragraph." Furthermore, on cross-examination, Mr. Mercado acknowledged that he "agreed to cooperate ultimately to save [his] own neck" and "minimize the harm" that would befall him.

Lastly, with respect to Mr. White's testimony, the jury was aware of the fact that he was testifying in exchange for a more lenient sentence pursuant to an agreement with the state. Just as the prosecutor had done with Mr. Mercado, he walked Mr. White through every paragraph of his agreement in front of the jury, asking him if it accurately reflected the agreement he had made.[8] On recross-examination, Mr. White testified that, prior to giving his statement, he had the opportunity to review "supplemental discovery," which included Mr. Mercado's statements. Mr. White then responded in the affirmative when he was asked: "And you decided that in order to get the best deal, you better give consistent information to that which [Mr.] Mercado had provided; right?" Thus, the jury was aware of all the information which defendant argues demonstrated the lack of credibility of Mr. White's testimony.

In spite of the just-discussed testimonial evidence that potentially could raise doubts in the minds of the jurors as to the credibility of Ms. Gallardo, Mr. Mercado, and Mr. White, the jury nonetheless convicted defendant. What is more, the trial justice found all three witnesses to

---

[8] We further note that Mr. White's extensive criminal record was also brought to the attention of the jury.

be credible and agreed with the jury's verdict.  We have "repeatedly stated that '[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for [a] new trial.'"  Silva, 84 A.3d at 418 (quoting State v. Ferreira, 21 A.3d 355, 367 (R.I. 2011)).  Accordingly, given the fact that we have no reason to quarrel with the trial justice's execution of the correct three-step analytical approach to a motion for a new trial and his ultimate agreement with the jury's verdict, it is clear to us that he did not overlook or misconceive material evidence and was not otherwise clearly wrong in denying defendant's motion for a new trial.

**B**

**The Admissibility of Ms. Gallardo's Testimony**

**1.  Standard of Review**

As we have reiterated on numerous occasions, "[d]ecisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice [and] this Court will not disturb those decisions on appeal absent an abuse of discretion."  State v. Moreno, 996 A.2d 673, 683 (R.I. 2010) (internal quotation marks omitted); see State v. Thomas, 936 A.2d 1278, 1281 (R.I. 2007); State v. Grayhurst, 852 A.2d 491, 504 (R.I. 2004).  Additionally, we have stated that this Court "will not reverse a trial justice's ruling admitting evidence over a Rule 403 objection unless it constitutes a clear abuse of discretion."  State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012).  Furthermore, it is well settled that we will not hold that a trial justice has "abused his or her discretion as long as some grounds supporting his or her decision appear in the record."  State v. Evans, 742 A.2d 715, 719 (R.I. 1999); see Thomas, 936 A.2d at 1283 ("Although [the abuse of discretion standard] is a stringent test, our jurisprudence illustrates that it does not insulate every ruling made by a trial justice.").  When reviewing a ruling under the

abuse of discretion standard, we "examine the ruling to ensure that the trial justice's discretion has been soundly and judicially exercised, * * * with just regard to what is right and equitable under the circumstances and the law." Selwyn v. Ward, 879 A.2d 882, 887 (R.I. 2005) (internal quotation marks omitted); see also State v. Kennedy, 814 A.2d 364, 365 (R.I. 2002) (mem.).

## 2. Discussion

The defendant contends that Ms. Gallardo's testimony with respect to defendant's behavior during their relationship was admitted in error because "the unfair prejudice of [the] testimony greatly outweighed its slight probative value." The defendant has provided this Court with a list of statements in which he contends Ms. Gallardo inappropriately testified to his "controlling behavior;" specifically that she testified that defendant "wanted to know everything she was doing and who she was talking to," was "possessive," and never let her take his photograph.[9] The defendant avers that the evidence was not relevant under Rule 401 of the

---

[9] The following is the full list of statements by Ms. Gallardo which defendant, in his brief to this Court, contends are at issue:

> "(1) That Mr. Virola wanted to know everything she was doing and who she was talking to * * * ;
> "(2) That Mr. Virola never let Ms. Gallardo take a photograph of him * * * ;
> "(3) That Mr. Virola would not let Ms. Gallardo move out of their home, and that he was blackmailing her to prevent this * * * ;
> "(4) That Ms. Gallardo told Mr. Virola that she was ending their relationship because he was being possessive and paranoid * * * ;
> "(5) That the reason Mr. Virola moved out of their apartment during the summer of 2011 was because he struck her during an argument * * * ;
> "(6) That she returned home to [the house she had previously shared with defendant] one evening to find her property destroyed * * * ; [and]
> "(7) That on the night she decided to go to the police to reveal Mr. Virola's status as being 'wanted,' she was receiving text messages and photographs from Mr. Virola indicating that he knew where she lived and that he was coming for her * * *."

Rhode Island Rules of Evidence "as it did not make it more or less likely that [defendant] participated in the conspiracy to rob" Mr. Nelson's apartment. The defendant further posits that, even if the testimony were relevant, its admission should have been barred by the provisions of Rule 403 because "[t]he distinct possibility existed that the jurors would be so disturbed by learning that Mr. Virola exhibited possessive, controlling or manipulative behaviors that they would reach an impermissible conclusion about his character and find him guilty based on improper character evidence."[10] The defendant claims that the only purpose served by the statements at issue was "to depict Mr. Virola as a violent individual who engaged in a pattern of domestic abuse during his relationship with Ms. Gallardo." In response, the state argues that

---

Of the seven statements, the ones numbered (1), (2), and (4) were made during Ms. Gallardo's direct testimony; the statement numbered (3) was made on cross-examination; and the statements numbered (5), (6), and (7) were made on redirect examination. The statements numbered (1) and (2) were properly preserved, as was the use of the word "possessive" to describe defendant in statement number (4). However, the remaining statements are not properly before us. With respect to statement number (4), defendant objected to the use of the word "paranoid" and that word was stricken from the record by the trial justice. See State v. Payano, 528 A.2d 721, 726 (R.I. 1987). After statement number (3), defendant did not move to strike Ms. Gallardo's response to his questions or request a cautionary instruction; therefore, defendant's appeal as to that statement was not properly preserved. See State v. Lyons, 725 A.2d 271, 275 (R.I. 1999) (holding that when, during cross-examination, "[d]efense counsel made no motion to strike the response nor requested any cautionary instruction * * * the trial justice committed no error" in allowing the testimony). Addressing statement number (5), defendant specifically stated at trial: "I don't object to this. It's fine. I'm not raising an objection." See State v. Bettencourt, 723 A.2d 1101, 1107 (R.I. 1999) ("Another basic rule of our appellate practice is that this [C]ourt will not review objections that were not raised at trial."). With respect to statement number (6), defendant did not object. See id. Therefore, part of statement number (4) and the statements in numbers (3), (5), and (6) are not appropriately before us.

Accordingly, we shall address only those statements, referenced in the text (and reflected in the statements numbered (1), (2), and (4)), which are properly before us for review. We shall discuss the statement numbered (7) in more depth in the text, infra.

[10] The above quotation contains the only passing reference in defendant's brief to Rule 404(b) of the Rhode Island Rules of Evidence, which rule governs the admission of character evidence. The state, in its brief, does address a Rule 404(b) argument; however, defendant's mere reference to character evidence is not sufficient to raise the issue on appeal. Accordingly, any argument with respect to Rule 404(b) is deemed to be waived. See Wilkinson, 788 A.2d at 1131 n. 1; see also Horton, 22 A.3d at 1130; Chase, 9 A.3d at 1256.

"the admission of [Ms.] Gallardo's testimony represented a sound exercise of the trial justice's discretion."

Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 of the Rhode Island Rules of Evidence further states that "[a]ll relevant evidence is admissible, except as otherwise provided by * * * other rules applicable in the courts of this state." Finally, Rule 403 sets forth the criteria for the exclusion of relevant evidence; it provides as follows:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

We shall address defendant's contentions under Rule 401 and Rule 403 in turn.

### i. Rule 401

The defendant first contends that the specific statements of Ms. Gallardo regarding his controlling behavior and refusal to be photographed were not relevant under Rule 401. This Court has stated that "[i]nherent in Rule 401 are two basic facets of relevant evidence-materiality and probativeness * * * [and] [i]f the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial * * * [and] should be excluded." Thomas, 936 A.2d at 1282 (internal quotation marks omitted). We are unable to detect any abuse of discretion in the trial justice's decision to admit Ms. Gallardo's testimony. Ms. Gallardo specifically stated that defendant told her that his behavior was a result of being "wanted" by the State of Rhode Island. That fact had an obvious tendency to show that the individual living as "Benny Delgado" in Arizona was in fact defendant, Ramon Virola. Moreover, it helped illustrate defendant's

consciousness of guilt.  Therefore, we hold that defendant's contention that Ms. Gallardo's statements were not relevant is not persuasive.

### ii.  Rule 403

The defendant next contends that, even if Ms. Gallardo's statements were relevant, the trial justice erred in failing to exclude them pursuant to Rule 403.  Rule 403 requires a balancing test; the trial justice must weigh the probative value of the evidence against its prejudicial nature.  See Brown, 42 A.3d at 1244.  However, "there exists no precise formula for determining the prejudicial effect of a statement."  State v. Dyer, 813 A.2d 71, 74 (R.I. 2003).  Moreover, the discretion to exclude evidence pursuant to Rule 403 "must be exercised sparingly," Brown, 42 A.3d at 1244 (internal quotation marks omitted), and "only when [the] evidence demonstrate[s] mere marginal relevance and enormous unfair prejudice should the trial justice exclude it."  State v. Bishop, 68 A.3d 409, 422 (R.I. 2013); see also State v. DeJesus, 947 A.2d 873, 883 (R.I. 2008); Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1193 (R.I. 1994).  This Court has applied a standard which "asks whether [the evidence] will inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt."  State v. O'Brien, 774 A.2d 89, 107 (R.I. 2001) (internal quotation marks omitted); see also Grayhurst, 852 A.2d at 507 ("Although the testimony at issue was certainly prejudicial, [a]ll of the evidence that tends to prove that [the] defendant is guilty of a crime might be said to be prejudicial.") (internal quotation marks omitted).

In the instant case, the trial justice stated on the record that some of the issues surrounding Ms. Gallardo's testimony about defendant's purportedly controlling behavior had been "air[ed]" in chambers, but he noted that Ms. Gallardo's testimony, including the statements

properly at issue on appeal, was admissible as it was evidence of flight. The trial justice specifically pointed to the fact that Ms. Gallardo testified that defendant actually <u>attributed</u> his controlling and possessive behavior to his being "wanted." Finally, the trial justice stated: "This is all evidence of guilty knowledge and very, very relevant. And to the extent that there's any prejudice involved, it is minimal, indeed, compared to the high relevance, and I will certainly permit this kind of evidence to be adduced." The trial justice cited to <u>State v. Reyes</u>, 705 A.2d 1375 (R.I. 1998), which supports the proposition that evidence of flight can be considered by a jury, "not because it raises a legal presumption of guilt, but because it is a circumstance bearing upon the question of the [defendant's] guilt which may be presented for the consideration of the jury." <u>Id.</u> at 1375 n. 2 (quoting <u>State v. Falcone</u>, 41 R.I. 399, 401, 103 A. 961, 961 (1918)).

After reviewing the trial justice's decision, we are satisfied that he soundly exercised his discretion and properly articulated the grounds on which he was permitting the testimony. <u>See</u> <u>Selwyn</u>, 879 A.2d at 887; <u>Evans</u>, 742 A.2d at 719. In addition to testifying that defendant exhibited controlling, "possessive" behavior, Ms. Gallardo also testified that defendant stated that <u>the</u> <u>reason</u> he behaved in such a way was because he was "wanted." As evidence of flight, consciousness of guilt, and the fact that "Benny Delgado" was Ramon Virola, this testimony was extremely probative. Though there may have been some prejudice in portraying defendant as "possessive" and as unwilling to be photographed, that possible prejudice could not outweigh such high probative value; this is certainly not a situation where the evidence at issue exhibited marginal relevance and enormous prejudice. <u>See</u> <u>DeJesus</u>, 947 A.2d at 883. Actually, it is quite the opposite—the evidence in the instant case was enormously relevant and marginally prejudicial. As such, we hold that the trial justice did not abuse his discretion under Rule 403 when he admitted Ms. Gallardo's statements over defendant's objections.

### iii. Statement Number (7) by Ms. Gallardo

The defendant lists the following as the seventh statement by Ms. Gallardo with which he takes issue on appeal: "That on the night she decided to go to the police to reveal Mr. Virola's status as being 'wanted,' she was receiving text messages and photographs from Mr. Virola indicating that he knew where she lived and that he was coming for her * * *." See footnote 9, supra. The defendant did object to Ms. Gallardo's just-referenced testimony at trial; however, he "opened the door" to the issue during his cross-examination of Ms. Gallardo. Consequently, there was no abuse of discretion in the trial justice's overruling of defendant's objection.

On cross-examination, the defendant asked Ms. Gallardo questions regarding her reasons for moving out of the home which she had shared with the defendant, without informing the defendant, in order to move to Chino Valley with Alice. That questioning elicited the fact that she acted in that way even though she had stated that the defendant loved and provided for his son. It also elicited the fact that the defendant called and asked about their son and that she continued to communicate with the defendant by text message regarding their son even after she had moved. It is the contention of the state, with which this Court agrees, that the state was free, on redirect examination, to elicit the testimony at issue in order to illustrate what the state was contending was Ms. Gallardo's reason for moving without informing the defendant—that she was afraid of him. That testimony counteracted the attempts on cross-examination to suggest that Ms. Gallardo's motives in moving had to do solely with pursuing her new relationship. Therefore, the defendant's arguments on appeal with respect to statement number (7) are unavailing. See, e.g., State v. Mastracchio, 112 R.I. 487, 495, 312 A.2d 190, 195 (1973) (holding that "[o]nce [the] defendant opened up the door to [certain] evidence in an attempt to impeach [a witness's] credibility, he could not complain when the state followed with further

- 26 -

testimony of a like character in clarification of what had been brought up on cross-examination").

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction and its denial of the defendant's motion for a new trial. The record may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** State v. Ramon Virola.

**CASE NO:** No. 2013-365-C.A.
(P1/04-3981CG)

**COURT:** Supreme Court

**DATE OPINION FILED:** June 4, 2015

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Associate Justice William P. Robinson III

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

For State: Lauren S. Zurier
Department of Attorney General

For Defendant: Lara E. Montecalvo
Office of the Public Defender