**Supreme Court**

No. 2015-158-C.A.

(K2/11-798A)

|                             |   |
|-----------------------------|---|
| State                       | : |
|                             |   |
| v.                          | : |
|                             |   |
| Patrick Timothy McDonald.   | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                    :

v.                                       :

Patrick Timothy McDonald.                :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**    The defendant, Patrick Timothy McDonald,

appeals from a judgment of conviction on three separate counts of embezzlement and one count

of conspiracy to commit embezzlement.  This case came before the Supreme Court pursuant to

an order directing the parties to appear and show cause why the issues raised in this appeal

should not be summarily decided.  After considering the parties' written and oral submissions

and reviewing the record, we conclude that cause has not been shown and that this case may be

decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm

the judgment of the Superior Court.

**I**

**Facts and Procedural History**

On November 29, 2011, defendant was charged by criminal information with five counts

of embezzlement in violation of G.L. 1956 § 11-41-3[1] and one count of conspiracy to commit

---

[1] General Laws 1956 § 11-41-3 states, in pertinent part, that:

embezzlement in violation of G.L. 1956 § 11-1-6.[2]  The criminal information alleged that, between June 1, 2007, and December 31, 2008, defendant colluded with Kimberly Gostomski to embezzle funds totaling $166,303.[3]  These funds were entrusted to defendant in his capacity as a real estate attorney; Gostomski worked as defendant's paralegal.[4]  A jury trial was held in January 2014.  The evidence adduced at trial may be summarized as follows.

Martin Aguilar was the first witness to testify.  Aguilar testified that, on July 24, 2008, he purchased real estate in Coventry from E.M.C. Mortgage Group (E.M.C. Mortgage) for $140,000, which he financed through Sun Trust Mortgage, Inc. (Sun Trust Mortgage).  The

---

> "[E]very officer, agent, clerk, servant, or other person to whom any money or other property shall be entrusted for any specific purpose, * * * who shall embezzle or fraudulently convert to his or her own use, or who shall take or secrete, with intent to embezzle or fraudulently convert to his or her own use, any money or other property which shall have come into his or her possession or shall be under his or her care or charge by virtue of his or her employment * * * shall be deemed guilty of larceny * * *."

[2] General Laws 1956 § 11-1-6 states that:

> "Except as otherwise provided by law, every person who shall conspire with another to commit an offense punishable under the laws of this state shall be subject to the same fine and imprisonment as pertain to the offense which the person shall have conspired to commit, provided that imprisonment for the conspiracy shall not exceed ten (10) years."

[3] The defendant was charged as follows: embezzlement or fraudulent conversion in violation of §§ 11-41-3 and 11-41-5 as agent of Frank Hennessey, to wit, $1,050 (count 1); embezzlement or fraudulent conversion in violation of §§ 11-41-3 and 11-41-5 as agent of Normand LeClair, to wit, $1,050 (count 2); embezzlement or fraudulent conversion in violation of §§ 11-41-3 and 11-41-5 as agent of Joseph Tavarozzi, to wit, $36,224.78 (count 3); embezzlement or fraudulent conversion in violation of §§ 11-41-3 and 11-41-5 as agent of Kevin Williams, to wit, $1,115.58 (count 4); embezzlement or fraudulent conversion in violation of §§ 11-41-3 and 11-41-5 as agent of Martin Aguilar, to wit, $126,862.64 (count 5); and conspiracy to commit embezzlement in violation of G.L. 1956 § 11-1-6 (count 6).

[4] Kimberly Gostomski, alias Kimberly Porter, was also charged with conspiracy to embezzle in violation of §§ 11-41-3 and 11-1-6 (count 6), with aiding and abetting defendant to commit embezzlement in violation of §§ 11-41-3 and 11-1-3 (count 7), larceny in violation of §§ 11-41-1 and 11-41-5 (count 8), embezzlement or fraudulent conversion in violation of §§ 11-41-3 and 11-41-5 (count 9), obtaining money under false pretenses in violation of §§ 11-41-4 and 11-41-5 (count 10) and forgery in violation of G.L. 1956 § 11-17-1 (count 11).  She later pled nolo contendere to all of these charges.

defendant was the settlement agent for the transaction, and on July 24, 2008, Sun Trust Mortgage wired $126,215.97 to defendant's IOLTA account[5] to be disbursed to E.M.C. Mortgage after the closing. Aguilar ostensibly purchased title insurance from defendant underwritten by Mortgage Guarantee & Title Insurance Company (Mortgage Guarantee & Title). Aguilar stated that, at the closing, defendant gave him a commitment for title insurance, which defendant had signed, and a closing protection letter, which insured Sun Trust Mortgage against loss arising out of "[f]raud or dishonesty of the * * * [a]pproved [a]ttorney in handling [its] funds." E.M.C. Mortgage never received the sales proceeds from defendant. Aguilar testified that, approximately one month after the closing, E.M.C. Mortgage's attorney notified him that defendant had never disbursed any funds. Aguilar further testified that he met with Chief Disciplinary Counsel David Curtin and also filed an insurance claim with Mortgage Guarantee & Title. According to Aguilar, however, Mortgage Guarantee & Title informed him that his title insurance policy was "null and void."

Next, the jury heard testimony from Joseph Tavarozzi. Tavarozzi explained that, in February 2008, he refinanced two existing mortgage loans on his real estate located in Warwick through IndyMac Bank (IndyMac). The defendant was the settlement agent for the refinancing transaction; and, on February 29, 2008, IndyMac wired $147,862.27 to defendant's IOLTA account. The defendant was expected to disburse a total of $137,916.13 to Countrywide Home Loans (Countrywide) on February 29—$101,691.35 to pay off Tavarozzi's first Countrywide loan and $36,224.78 to pay off Tavarozzi's second Countrywide loan. Tavarozzi also purchased title insurance from defendant underwritten by Mortgage Guarantee & Title. Tavarozzi attested

---

[5] Article V, Rule 1.15(f) of the Supreme Court Rules of Professional Conduct requires an attorney to deposit client or third-party funds into an interest-bearing trust account, the interest proceeds of which are payable to the Rhode Island Bar Foundation. These accounts are referred to as Interest on Lawyers' Trust Accounts or "IOLTA" accounts.

that, at the time of the closing, he was three months ahead on his mortgage payments to Countrywide. According to Tavarozzi, approximately four months after the closing, Countrywide notified him that his mortgages had not been paid. Tavarozzi testified that, upon receiving this notification from Countrywide, he attempted to contact defendant, but was never able to reach him. Instead, he spoke to Gostomski about the unpaid loans. Tavarozzi attested that, in June 2008, Gostomski called him to inform him that the first loan had been paid. Tavarozzi further testified that he received another call from Countrywide in August 2008 notifying him that the second loan for $36,224.78 was still outstanding. Tavarozzi explained that he again attempted to contact defendant, and, unable to reach either defendant or Gostomski, contacted Mortgage Guarantee & Title to file a claim under his title insurance policy. Tavarozzi attested that Mortgage Guarantee & Title paid Countrywide the outstanding balance on his second loan. The defendant never paid Countrywide the $36,224.78 on Tavarozzi's second loan.

The jury also heard testimony from Michele Green, Senior Corporate Underwriter and Vice President of First American Title Insurance Company—formerly known as Mortgage Guarantee & Title. Green testified that defendant was an agent with Mortgage Guarantee & Title from January 2007 through May 2008. On May 9, 2008, however, Mortgage Guarantee & Title terminated its agency agreement with defendant because, as it explained in its correspondence to defendant, he failed to complete an "escrow review." According to Green, an escrow review monitors for agent fraud and includes examining attorneys' IOLTA accounts, real estate closing documents, and cross-referencing policies issued with premiums collected. Green testified that, upon defendant's termination from Mortgage Guarantee & Title, the company promptly blocked defendant's access to its computer systems and notified all lenders to which it had issued closing protection letters, and whose transactions were still pending with defendant, that it was revoking

the closing protection letters because defendant was no longer an active agent.

Green further recalled that, in August 2008, Tavarozzi contacted her to file a claim under his title insurance policy. According to Green, on Friday, August 29, she attempted to contact defendant about Tavarozzi and left defendant a voice mail saying, "We have somebody in our office who is making extremely serious allegations about a closing that you conducted. This is very[,] very serious. I need to speak to you right away. Please call me or e-mail me." In response, defendant emailed Green, notifying her that he was on his way to his office to "get [her] the information A.S.A.P." Green testified, though, that she did not hear back from defendant until Tuesday, September 2, despite "dozens" of attempts to contact him over the holiday weekend. At 9:47 a.m. on September 2, defendant sent Green an email reading, in part, "The loan was not paid off. First thing this morning I requested an up-to-date payoff and will be wiring out the funds as soon as I receive it [sic] * * *." The subject line read "15 Chelmsford Avenue Warwick"—Tavarozzi's address. According to Green, however, she had never disclosed to defendant which client she was contacting him about.

On Wednesday, September 3, defendant sent Green and her supervisor an email informing them that, prior to Green's contact on August 29, 2008, he was not aware that Tavarozzi's first loan had been paid late and that the second loan had not been paid at all. In the email, defendant acknowledged that Gostomski was informed of this and that she had "numerous phone conversations" with Tavarozzi. In the email, defendant also wrote that he "ordered the payoff [on] the second mortgage [and that it would] be paid today or tomorrow" and that he had "taken steps to ensure that this [did] not happen again." Green replied by sending defendant a fax questioning his version of events, writing in part:

> "The series of events you describe [do] not make a lot of sense, or
> stand up to scrutiny. Your recitation of events seems to suggest

that your paralegal Kim either misappropriated the funds from this closing or, for some unknown reason, failed to make the disbursements even when numerous calls from the client were made. She further, according to you, failed to notify you of any of these events.

"It is my understanding that, despite her having committed these grievous errors in judgment, she is still in your employ.

"In any scenario of events, had no misappropriation taken place, your client account would have had nearly $138,000 in it for 5-6 months that you would have no accounting for. How would that have escaped your notice?

"In any event, since you have chosen to ignore our numerous phone calls of this morning seeking an explanation of these discrepancies, or proof that these funds have indeed been in your client account for these entire six months, you can expect to be required to deliver such explanations and proof to Rhode Island Disciplinary Counsel and the Rhode Island State Police, both of whom have now been notified."

Green testified that defendant never responded to her fax. Green further testified that she knew defendant had not paid off Tavarozzi's second loan with Countrywide. Green attested that, with respect to Tavarozzi's insurance claim, Mortgage Guarantee & Title paid off his second Countrywide loan. Green also attested that Mortgage Guarantee & Title received a title insurance claim from Aguilar alleging that defendant never disbursed the sales proceeds after Aguilar's closing. Green testified, however, that Mortgage Guarantee & Title had never issued a title insurance policy to Aguilar and that the closing protection letter and title insurance commitment defendant gave to Aguilar were forged.

Next, the jury heard testimony from defendant's alleged co-conspirator, Gostomski. Gostomski explained that she met defendant while she was working for another real estate attorney and that, after leaving that attorney's office, she remained in contact with defendant. Gostomski testified that, in or around January 2007, Gostomski and defendant began a romantic

relationship. Gostomski further attested that, by that time, defendant had opened his own real estate law office and, in March or April of that year, she began working for him. Gostomski testified that she was defendant's only employee, and that her position included preparing all pre-and-post-closing documents for the office's real estate transactions. Gostomski attested that, at some point during the course of her employment, she began doing "some," but not "all," of the bookkeeping. According to Gostomski, although she was not listed as a signatory on either defendant's IOLTA or business-operating account, she, with defendant's permission, issued and signed checks from both of these accounts. Gostomski testified that she did not have the ability to access defendant's accounts online, but that defendant monitored both accounts' activities regularly. She recounted that she "would come in usually in the morning and that was usually up on the computer[;] what the balances were, what transactions had transpired in both accounts * * *." Gostomski also testified that defendant had what she believed to be the business-operating account's only ATM card.

According to Gostomski, in February and March 2008, the office began to unravel, meaning that "a lot of things got overlooked" and "were not being handled correctly." At this time, she explained that defendant's business-operating account was frequently overdrawn, and, on occasion, she had transferred unearned legal fees from defendant's IOLTA account to his business-operating account. Gostomski testified that, even as the number of real estate closings continued to decrease, defendant never changed his spending habits. Gostomski attested that, when the business-operating account balance was really low, defendant would ask her "[w]hat do we have in the pipeline?"

Gostomski further testified about defendant's working relationship with Mortgage Guarantee & Title. Gostomski testified that, during Mortgage Guarantee & Title's repeated

attempts to audit defendant, defendant instructed her to withhold certain IOLTA account statements. According to Gostomski, during this time, defendant considered becoming an agent with another title insurance company, but did not pursue the matter any further after the company requested to review defendant's IOLTA account statements. Gostomski testified that defendant "kept saying that [they] needed to open a new IOLTA account and start fresh so that there was [sic] no discrepancies." She further attested that defendant would intentionally avoid Mortgage Guarantee & Title's representative saying, "[H]ere comes [a representative] from Mortgage Guarantee. I'm going to go out the back door * * *." Gostomski also testified that she believed that she saw the cancellation notice from Mortgage Guarantee & Title on defendant's desk.

Gostomski also testified about the Aguilar closing. According to Gostomski, because Mortgage Guarantee & Title terminated defendant as an agent, she prepared the closing protection letter for Aguilar's closing by copying and pasting the letter together from previously authorized letters because defendant told her that "all closings had to close." Gostomski also testified that defendant gave Aguilar the forged closing protection letter. According to Gostomski, defendant withdrew his legal fee for the Aguilar closing thirteen days before the closing date because defendant needed money. Moreover, Gostomski also testified regarding Tavarozzi's refinancing transaction. Gostomski stated that, on July 31, 2008, after Tavarozzi contacted her, she initiated a wire transfer to pay off Tavarozzi's first Countrywide loan— approximately five months after the closing in February 2008. She explained that funds from real estate closings are typically, in the case of a sale, disbursed immediately after the closing and, in the case of a refinance, disbursed three days after the closing. Gostomski testified that, after Mortgage Guarantee & Title contacted defendant about Tavarozzi, "[i]t did [not] seem like [defendant] took it as serious as [she] did" because he left the office that day as usual.

Gostomski also acknowledged that she had a criminal record and that defendant learned about this in December 2007.[6]

Lori Tellier, a certified public accountant, certified fraud examiner, and civilian investigator in the state police's financial crimes unit, was the final witness to testify. As part of the state police's investigation into the allegations against defendant, Tellier conducted a forensic audit of defendant's IOLTA and business-operating accounts. Tellier testified that this audit revealed that defendant, in fact, on several occasions did not disburse funds to the proper payees, despite having received sufficient funds from each lender prior to each transaction. Tellier further testified that defendant made improper disbursements from his IOLTA account. According to Tellier, total outflows from defendant's IOLTA account to defendant, between January 2007 and September 2008, totaled approximately $496,000. Tellier attested that, out of the $496,000 withdrawn from defendant's IOLTA account, only $386,678.35 was legal fees earned by defendant. Tellier testified that her analysis revealed a pattern wherein transfers, including online transfers, were made from defendant's IOLTA account to his business-operating account to prevent the operating account from being overdrawn.

Tellier determined that approximately $168,000 entrusted to defendant was not remitted to the proper payees. Tellier testified that defendant spent this missing client money on personal expenses. She explained that defendant made over $87,000 in ATM withdrawals from his business-operating account. Tellier further explained that, from his business-operating account, defendant used the missing client money to pay the following estimated personal expenses:

---

[6] On direct examination, Gostomski acknowledged that, in 1995, she pled nolo contendere to embezzlement and was sentenced to an eight-year suspended term of incarceration with probation. Further, in 1998, she pled nolo contendere to the fraudulent use of credit cards and was sentenced to a three-year term, with two years to serve in home confinement and the remainder to serve on probation. And, in 2001 and 2002, she pled nolo contendere to the fraudulent use of checks and was sentenced to a one-year suspended term of incarceration and one-year probation.

$30,000 in mortgage payments; $13,000 in car payments; $6,700 in grocery purchases; $8,600 in clothing purchases; $14,000 in household purchases; $9,600 in entertainment purchases; $1,800 in restaurant charges; $2,800 in furniture purchases; and $11,000 to Gostomski in addition to her weekly payroll. Tellier also testified about a $5,000 internet transfer from defendant's IOLTA to his business-operating account that, according to the state, coincided with his vacation to Pennsylvania.

Additionally, the parties stipulated to the following facts. On June 21, 2007, defendant was the settlement agent in a real estate transaction involving Frank Hennessey and Normand LeClair. Hennessey and LeClair, as Trustees of the Hennessey/LeClair Trust, sold real estate located in Exeter for $35,000, and, on June 21, the sales proceeds were deposited into defendant's IOLTA account. Because Hennessey and LeClair were not Rhode Island residents at the time of the sale, defendant was required to withhold a total of $2,100 to pay the nonresident real-estate-sales tax due to the Rhode Island Division of Taxation. The defendant never made any payments to the Division of Taxation to satisfy Hennesey and LeClair's tax obligation and, as a result, the state withheld the taxes due from Hennesey and LeClair's income tax refunds that tax year. Further, on March 17, 2008, defendant was the settlement agent in a real estate transaction involving Kevin Williams, who purchased real estate located in Providence. Wachovia Mortgage Funding, Williams' lender, wired funds into defendant's IOLTA account on March 17 and 18 of 2008. Out of these funds, defendant withheld $1,115.58 to pay real estate property taxes due to the City of Providence, but he never made the payment to the city.

At the close of the state's case-in-chief, defendant filed a motion for judgment of acquittal, which was heard and denied on January 15, 2014. The defendant did not present any witnesses. After deliberation, the jury found defendant guilty of three counts of embezzlement

(counts 3, 4, and 5) and of conspiracy to commit embezzlement (count 6), but acquitted defendant of two other counts of embezzlement (counts 1 and 2). Thereafter, defendant filed a motion for a new trial, which was heard on February 10, 2014. The defendant argued that "the evidence presented by the [s]tate at trial was not sufficient * * * to prove * * * guilt beyond a reasonable doubt * * *." In denying the motion, the trial justice agreed with the jury's verdict, finding that the evidence of defendant's knowledge and intent was "overwhelming." On April 30, 2014, the trial justice sentenced defendant to a fifteen-year term of incarceration for counts 3, 4, and 5, to run concurrently, with four and a half years to serve, the balance suspended, with probation. On the conviction for conspiracy, the trial justice sentenced defendant to a five-year suspended term of incarceration, with probation, to run consecutively. Subsequently, defendant filed a timely notice of appeal.[7]

## II

### Discussion

On appeal, defendant argues that the trial justice erred in denying his motion for a new trial because there was insufficient evidence to support the jury's verdict and in "fail[ing] in his role as the thirteenth juror by misconceiving the evidence." Additionally, he argues that the trial justice erred in admitting Green's fax correspondence because it was irrelevant and unfairly prejudicial. We shall address these arguments separately herein.

### A

### The Defendant's Motion for a New Trial

The defendant argues that the trial justice erred in denying his motion for a new trial because the state failed to prove that he had the requisite intent to commit embezzlement in light

---

[7] On May 30, 2014, defendant filed a second motion for a new trial based on newly discovered evidence, which was heard and denied on September 12, 2014. The denial of this second motion for a new trial is not challenged on appeal.

of Gostomski's "unfettered access" to his IOLTA and business-operating accounts. He asserts that the evidence adduced at trial proves only that he was negligent in monitoring his IOLTA account and in supervising Gostomski. Indeed, as defendant sees it, the trial justice was clearly wrong in crediting Gostomski—whom he described as a "jilted girlfriend and veteran embezzler"—when there was evidence to suggest that she was directly responsible for these crimes.

It is well-settled that a defendant arguing a motion for a new trial may do so on two bases: (1) insufficiency of the evidence and (2) weight of the evidence. State v. Clark, 974 A.2d 558, 570-71 (R.I. 2009). Although defendant challenges the "sufficiency" of the evidence on appeal, which would require an examination of the trial evidence in the light most favorable to the prosecution, State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011), "[defendant's] arguments and presentation of the law * * * to the trial justice * * * ask[ed] that his appeal be viewed through the prism of the more traditional, weight-of-the-evidence standard." State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014). Specifically, at the hearing on his motion for a new trial, although defendant articulated that the evidence was insufficient, he nevertheless asked the trial justice, "sitting as * * * a thirteenth juror," to weigh the evidence. Accordingly, we deem his argument as it relates to sufficiency of the evidence to be waived, and we limit our review to his weight-of-the-evidence argument. See id.[8]

---

[8] In any event, even if we were to deem defendant's sufficiency-of-the-evidence argument to be preserved (despite his asking the trial justice to weigh the evidence), "a defendant seeking to prevail on a motion for a new trial based on the sufficiency of the evidence bears a heavier burden than does a defendant seeking to prevail on a weight of the evidence argument * * *." State v. Mendez, 116 A.3d 228, 246 (R.I. 2015). Because we affirm the trial justice's finding that defendant failed to meet the lesser burden, we need not go further.

## 1. Standard of Review

When deciding a motion for a new trial based on the weight-of-the-evidence standard, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Watkins, 92 A.3d 172, 191 (R.I. 2014) (quoting State v. Clay, 79 A.3d 832, 841 (R.I. 2013)). "In so deciding, 'the trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury.'" Id. (quoting Clay, 79 A.3d at 841-42). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. (quoting Clay, 79 A.3d at 842). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." Id. (quoting Clay, 79 A.3d at 842). The fourth step of the analysis requires the trial justice to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted." State v. Guerra, 12 A.3d 759, 765-66 (R.I. 2011) (quoting State v. Rivera, 839 A.2d 497, 503 (R.I. 2003)).

"Because a trial justice, when deciding a motion for a new trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses, on appeal, this Court's review is deferential." Watkins, 92 A.3d at 191 (quoting Clay, 79 A.3d at 842). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Clay, 79 A.3d at

842).

## 2. Analysis

Section 11-41-3 provides, in pertinent part, that:

> "[E]very officer, agent, clerk, servant, or other person to whom any money or other property shall be entrusted for any specific purpose, * * * who shall embezzle or fraudulently convert to his or her own use, or who shall take or secrete, with intent to embezzle or fraudulently convert to his or her own use, any money or other property which shall have come into his or her possession or shall be under his or her care or charge by virtue of his or her employment * * * shall be deemed guilty of larceny * * *."

To prove embezzlement under § 11-41-3, the state must show that a defendant: (1) "was entrusted with the property for a specific use"; (2) "came into possession of the property in a lawful manner"; and (3) "intended to appropriate and convert the property to his own use and permanently deprive that person of the use." State v. McKone, 673 A.2d 1068, 1073 (R.I. 1996) (quoting State v. Oliveira, 432 A.2d 664, 666 (R.I. 1981)). The defendant contends that the state failed to prove that he intentionally converted his clients' property.

After a careful review of the trial transcript and exhibits, it is our opinion that the trial justice did not overlook or misconceive material evidence, and that he articulated sufficient grounds for denying defendant's motion for a new trial. The trial justice found that the evidence of defendant's knowledge and intent was "overwhelming." He described the "significant paper trail" introduced through Tellier's extensive testimony. Further, he considered Tellier's testimony that transfers from defendant's IOLTA to his business-operating account coincided with vacations and that the amount of income defendant received significantly exceeded the legal fees he earned. He determined that the witness testimony and documentary evidence were sufficient to support defendant's convictions. The trial justice's findings were all supported by the record, and the evidence presented at trial met the necessary elements to convict defendant of

embezzlement.

With respect to counts 3, 4, and 5, defendant was the settlement agent for each transaction and, accordingly, he was entrusted with funds for the specific purpose of disbursing those funds after each closing. As Tellier testified, defendant's bank records showed that, prior to each transaction, he received sufficient funds to make the required disbursements. Tellier further testified that defendant's bank records showed that, in each of these transactions, he never disbursed the funds to the proper payee. In the case of Aguilar (count 5), defendant received $126,215.97 from Aguilar's lender, which he was required to disburse to the seller after the closing. The defendant never made this disbursement. In the case of Tavarozzi (count 3), defendant received $147,862.27 from Tavarozzi's lender—$36,224.78 of which should have been disbursed to Countrywide to pay off Tavarozzi's second mortgage loan. The defendant, again, never made this disbursement. And, in the case of Williams (count 4), defendant stipulated that he never disbursed $1,115.58 to the City of Providence on behalf of Williams.

It is also our opinion that the trial justice did not overlook material evidence when deciding that the evidence adduced at trial established the intent element of embezzlement. The trial evidence not only established that defendant failed to disburse the monies to the proper payees; it also established that he actually spent much of the money on himself. As previously noted, Tellier specified that defendant was using his business-operating account for personal expenses, from car payments to furniture purchases, totaling roughly $75,000, while at the same time failing to disburse the necessary payments to the proper payees. Therefore, the trial justice's determination that the evidence adduced at trial supported a finding that defendant "intended to appropriate and convert the [money] to his own use and permanently deprive [another] of the use," was not clearly wrong. See McKone, 673 A.2d at 1073 (quoting Oliveira,

- 15 -

432 A.2d at 666). It is this Court's opinion that the record established each element of embezzlement as alleged in counts 3, 4, and 5.[9]

Moreover, the evidence also showed that Mortgage Guarantee & Title terminated its agency agreement with defendant because he failed to complete its annual escrow review. Further, Green testified about defendant's evasive and misleading responses to her inquiries. The defendant's uncooperativeness in completing Mortgage Guarantee & Title's escrow review, and his attempts to avoid Green, coupled with the evidence of how he handled the money entrusted to him, all support the basis for the inference that he acted with the requisite intent to embezzle. It is clear to us, therefore, that the trial justice conducted the appropriate analysis and was not clearly wrong in denying defendant's motion for a new trial.

**B**

**The Admissibility of Green's Correspondence**

The defendant further maintains that the trial justice erred in admitting into evidence Green's fax correspondence expressing her opinion about his veracity and credibility because it was both irrelevant and prejudicial. The trial justice found that Green's correspondence was relevant to the issue of intent and that its probative value "outweighed its prejudicial effect." In our opinion, the admission of Green's correspondence at trial was a sustainable exercise of the trial justice's considerable discretion in evidentiary rulings.[10]

---

[9] The defendant makes no argument to this Court that the evidence was insufficient to meet the conspiracy charge; accordingly, we do not address count 6.

[10] The trial justice admitted Green's correspondence under the business record exception to hearsay. Because defendant objected only on grounds that the correspondence had no probative value and was unfairly prejudicial at trial, this Court declines to decide whether Green's correspondence was properly admitted as a business record.

## 1. Standard of Review

It is well established that "[t]he admission or exclusion of evidence on grounds of relevancy is within the sound discretion of the trial justice * * *." State v. Lynch, 854 A.2d 1022, 1035 (R.I. 2004) (quoting State v. Calenda, 787 A.2d 1195, 1199 (R.I. 2002)). Thus, "absent a showing of abuse of this discretion, this Court will not disturb a ruling concerning the admissibility of evidence." Id. (quoting Calenda, 787 A.2d at 1199). Further, Rule 403 of the Rhode Island Rules of Evidence provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." This Court has stated that "determinations of relevance and prejudice are within the sound discretion of the trial justice, and such determinations will be upheld absent a showing of an abuse of this discretion." DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 692 (R.I. 1999).

## 2. Analysis

Rule 401 of the Rhode Island Rules of Evidence defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "This Court has stated that '[i]nherent in Rule 401 are two basic facets of relevant evidence—materiality and probativeness * * * [and] [i]f the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial * * * [and] should be excluded.'" State v. Virola, 115 A.3d 980, 996 (R.I. 2015) (quoting State v. Thomas, 936 A.2d 1278, 1282 (R.I. 2007)).

Here, defendant was charged with and convicted of embezzlement and conspiracy to commit embezzlement. The state had the burden to prove that defendant intentionally embezzled

funds entrusted to him. See § 11-41-3. Green's fax correspondence is the final communication from Green to defendant in a chain of communications between the two. The communication is relevant, as it created a timeline of events that led to defendant's ultimate prosecution. It also made it more probable that defendant had notice of the misappropriations of funds or, at a minimum, of the severe allegations that Green was making regarding such misappropriations. Accordingly, we are of the opinion that the trial justice did not abuse his discretion in finding that the evidence was relevant.

Moreover, Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *." "It is within the sound discretion of the trial justice whether to admit or exclude evidence under Rule 403." State v. Mlyniec, 15 A.3d 983, 997 (R.I. 2011) (quoting State v. John, 881 A.2d 920, 927 (R.I. 2005)). We have "said that 'a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly,' and '[i]t is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it.'" Mlyniec, 15 A.3d at 997 (quoting State v. DeJesus, 947 A.2d 873, 883 (R.I. 2008)).

In reviewing the trial justice's Rule 403 balancing, it is our opinion that he was not clearly wrong in finding that the probative value of Green's correspondence outweighed its prejudicial effect. Green's correspondence, as discussed herein, was more than "marginally relevant." Moreover, in light of the abundant inculpatory evidence against the defendant, both through trial testimony and exhibits, the defendant failed to show how Green's correspondence was "enormously prejudicial" to him. In our opinion, while the correspondence was clearly unfavorable to the defendant, it did not reach the level of being unfairly prejudicial. We also note that to the extent that Green's correspondence improperly gave an opinion regarding the

defendant's credibility—a function solely for the jury—the defendant did not request that the correspondence be redacted to remove such characterizations of credibility. Accordingly, we decline to disturb the trial justice's ruling.

## III

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Patrick Timothy McDonald. |
| **Case Number** | No. 2015-158-C.A. (K2/11-798A) |
| **Date Opinion Filed** | April 20, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For State:<br><br>Jane M. McSoley<br>Department of Attorney General |
| | For Defendant:<br><br>Lara E. Montecalvo<br>Office of the Public Defender |